UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY A. ROGERS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:19-CV-00166-RP |
| | § | |
| CITY OF HUTTO, TEXAS; | § | JURY DEMANDED |
| GREGORY RICHARD PARRIS; and | § | |
| JAMIE R. ALCOCER, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## SECOND AMENDED PLAINTIFF'S ORIGINAL COMPLAINT

> **Hutto Police Officer Gregory Parris abused police power by punching and Tasing Jeremy Rogers. Then, if that were not enough, he caused prosecution of Jeremy based on false or misleading accusations. Supervising Officer Jamie Alcocer failed to stop the use of force and joined in Officer Parris's arrest and support in prosecution of Mr. Rogers. Prosecutors saw through Officer Parris's anger-motivated attempts to prosecute Jeremy and dismissed the cases in the interest of justice.**



Table of Contents

I.   Introductory Allegations ....................................................................................... 4

    A.   Parties ..................................................................................................... 4

    B.   Jurisdiction ............................................................................................. 5

    C.   Venue .................................................................................................... 5

II.   Factual Allegations ............................................................................................. 6

    A.   Introduction ........................................................................................... 6

    B.   Jeremy Rogers ........................................................................................ 6

    C.   Officer Parris Unreasonably and Unnecessarily Assaults Jeremy ........................ 6

    D.   Officer Parris's and Officer Alcocer's Training ...................................... 16

    E.   Hutto Police Department Use of Force Policies .................................... 21

    F.   Officer Parris Causes Improper Prosecution of Jeremy ........................ 21

    G.   *Monell* Liability Facts .......................................................................... 25

        1.   Hutto's Policy, Practice, and/or Custom of Not Conducting Field Sobriety Tests was a Moving Force Behind and Caused Jeremy's Damages ........................................................................... 26

        2.   Hutto's Unwritten Policy, Practice, and/or Custom of Using Excessive Force was a Moving Force Behind and Caused Jeremy's Damages ........................................................................... 28

        3.   Hutto's Policy, Practice, and/or Custom of Hiring, Failing to Train, and Failing to Supervise Officer Parris was a Moving Force Behind and Caused Jeremy's Damages ............................................. 38

III.   Causes of Action ............................................................................................... 47

    A.   Cause of Action Against Defendant Gregory Richard Parris Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights: Excessive Force and Improper Seizure ................................................................................... 47

    B.   Cause of Action Against Defendant Jamie R. Alcocer Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights: Excessive Force and Improper Seizure .................................................................................. 52

    C.   Cause of Action Against Defendant Gregory Richard Parris Under 42 U.S.C. § 1983 for Violation of 1st Amendment Rights: Retaliation for Exercise of Rights to Free Speech and/or to Petition the Government for a Redress of Grievances ........................................................................ 56

    D.   Cause of Action Against Defendant Jamie R. Alcocer Under 42 U.S.C. § 1983 for Violation of 1st Amendment Rights: Retaliation for Exercise of Rights to Free Speech and/or to Petition the Government for a Redress of Grievances ........................................................................ 58

E.    Cause of Action Against Defendant Gregory Richard Parris Under 42 U.S.C. § 1983 for Violation of 1st Amendment, 4th Amendment, and/or 14th Amendment Rights: False Arrest, Malicious/False Prosecution, and/or Due Process Violations ............................................................................................ 61

F.    Cause of Action Against Defendant Jamie R. Alcocer Under 42 U.S.C. § 1983 for Violation of 1st Amendment, 4th Amendment, and/or 14th Amendment Rights: False Arrest ........................................................... 67

G.    Cause of Action Against Defendant City of Hutto Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights:  Excessive Force and Improper Seizure ..................................................................................................... 70

H.    Cause of Action Against Defendant City of Hutto Under 42 U.S.C. § 1983 for Violation of 4th Amendment and/or 14th Amendment Rights:  False Arrest, Malicious/False Prosecution, and/or Due Process Violations ................. 72

IV.   Concluding Allegations ............................................................................. 74

A.    Conditions Precedent ........................................................................ 74

B.    Use of Documents ............................................................................ 74

C.    Jury Demand ................................................................................... 74

D.    Prayer ............................................................................................. 74

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

I.    Introductory Allegations

    A.    Parties

1.    Plaintiff Jeremy A. Rogers ("Mr. Rogers" or "Jeremy") is a natural person who resides and did reside, was domiciled in, and was a citizen of Texas at all relevant times.

2.    Defendant City of Hutto, Texas ("Hutto") is a Texas incorporated municipality / city.  Hutto was served with a summons for this case and a copy of Plaintiff's Original Complaint, and it made an appearance in this case.  Hutto acted or failed to act at all relevant times, in accordance with its customs, practices, and/or policies, through its policymakers, chief policymakers, employees, agents, representatives, and/or police officers and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).

3.    Defendant Gregory Richard Parris ("Officer Parris" or "Mr. Parris") is a natural person who resides and is domiciled in Texas.  Officer Parris was served with a summons for this case and a copy of Plaintiff's Original Complaint, and he made an appearance in this case.  Officer Parris is being sued in his individual capacity, and he acted at all relevant times under color of state law.  Officer Parris was employed by and/or was the agent and/or designee and/or contractor of and for Hutto at all such times and acted or failed to act in the course and scope of his duties for Hutto.

4.    Defendant Jamie R. Alcocer ("Officer Alcocer" or "Ms. Alcocer") is a natural person who resides and is domiciled, and may be served with process, at 1400 Westinghouse Road, Apartment 1716, Georgetown, Texas 78626.  Officer Alcocer may also be served with process at

her place of employment, Hutto Police Department, 401 W. Front Street, Hutto, Texas 78634. Officer Alcocer may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Officer Alcocer at Officer Alcocer's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Officer Alcocer is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Officer Alcocer was employed by and/or was the agent and/or designee and/or contractor of and for Hutto at all such times and acted or failed to act in the course and scope of her duties for Hutto.

### B.      Jurisdiction

5.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and a federal statute including but not necessarily limited to 42 U.S.C. § 1983.

6.      The court has personal jurisdiction over Hutto because it is a Texas municipality. The court has personal jurisdiction over the natural person Defendants because they reside in, are domiciled in, and are citizens of Texas.

### C.      Venue

7.      Venue is proper in the Austin Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(2), because it is the division in the district in which a substantial part of the events or omissions giving rise to claims asserted in this pleading occurred.

II.      Factual Allegations

   A.      Introduction

   8.      Plaintiff provides in the factual allegations sections below the general substance of certain factual allegations.  Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiff intends that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claim(s) have facial plausibility.  Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

   B.      Jeremy Rogers

   9.      Jeremy lives and works in the Williamson County area.  Jeremy was doing nothing unusual, and nothing to disturb the peace, on the night Officer Parris chose to assault him and have him prosecuted.

   C.      Officer Parris Unreasonably and Unnecessarily Assaults Jeremy

   10.      On May 31, 2018, Officer Parris and Officer Alcocer allegedly received a call to go to a house in Hutto, Texas due to the alleged smell of marijuana emanating from the house. They parked their car(s) nearby and walked down a sidewalk toward the house.  As they approached the house, they saw a truck parked in the driveway.  The truck was facing the residence, and the back of the truck was in the driveway and not extending as far as the sidewalk parallel to the front of the residence.

   11.      The police officers also saw Jeremy, who was located at the back of the pick-up. The tailgate was closed, and Jeremy was generally facing the street and talking on or using his

telephone.  There was a beer can to Jeremy's left on the rear bumper of the truck.  Therefore, Jeremy was doing nothing uncommon in the State of Texas, on just about any given night, in any part of the State.

12.    Officer Parris tells Jeremy that they had received a call regarding the smell of marijuana, and Officer Parris seemed to indicate that it was coming from the house.  Officer Alcocer asks Jeremy if he lived there, and he responds that he does not.  Officer Parris then asks essentially the same question, and Jeremy once again responds that he does not live there.  Officer Alcocer then asks something about Jeremy's friend and/or the resident of the home, and Jeremy asks if he could call him.  Officer Alcocer asks if he was at home, and Jeremy indicates that he was.

13.    Jeremy is holding his phone, apparently getting ready to call the person who lived in the home.  Officer Parris then says, "No, don't call him yet."  Jeremy has been and is being polite, responsive, and respectful.  Even though Jeremy is doing nothing wrong, Officer Parris tells Jeremy to put his phone down.  Officer Parris then tells Jeremy to put his hands on the truck.  Jeremy said, "For what?"  Officer Parris, impressed with his power as an armed police officer, responds, "Because I'm telling you to."

14.    It is abundantly clear to Officer Parris that Jeremy could not be hiding anything in his shirt, as he is wearing a short-sleeve t-shirt with no coat and/or anything covering it.  Nothing has occurred to make Officer Parris believe that Jeremy has any weapons, or is a threat to Officer Parris's and/or Officer Alcocer's safety.  There is no occurrence, and nothing that either police officer observes, that would give rise to reasonable suspicion, or probable cause, that the officers need to sweep the area for weapons and/or have any concern for their safety.

15.     Officer Parris then grabs Jeremy by the top back portion of Jeremy's jeans and shoves Jeremy in his upper back toward the pick-up.  Officer Parris shoves Jeremy not because he needs to do so, but because he is impressed with his ability as a police officer to get away with treating members of the public in such a manner.  Officer Parris, as he had when he walked up to greet Jeremy, referred to him again as "man."  He was using common verbiage that generally would not offend most people.  However, as indicated below, when Officer Parris was later referred to as "bro" during a cordial conversation with an apparent resident of the house, Officer Parris told the person not to call him "bro" but instead "sir."  This was further evidence of Officer Parris's aggressive tendencies, as opposed to a tendency to de-escalate a situation that he was escalating.

16.     Officer Parris asks Jeremy whether he has any weapons, and Jeremy responds, "No."  Officer Parris then conducts a pat-down search of Jeremy, while holding the back center top of Jeremy's pants with the hand he was not using to conduct the pat-down search.  Officer Parris has no reason to suspect that Jeremy possesses weapons but is instead conducting the pat-down search as a pretext to an attempt to find marijuana or some other contraband.

17.     Officer Parris then asks Jeremy if he has his I.D.  Jeremy removes his wallet from his back pocket and begins looking through it.  After brief discussion unrelated to the wallet or identification, Jeremy puts his wallet back into his pocket.

18.     Officer Parris then says, "Can I see your wallet?"  Jeremy responds, "Nope."  Officer Parris then demands that Jeremy provide his wallet by saying, "Give me your wallet."  Jeremy asks, as any citizen may do, in substance, "Why do you have probable cause?"  Officer Parris then responds, "Yeah, how 'bout you go to jail right now for public intoxication?"  Officer

Alcocer knows that Jeremy's rights are being violated, has a reasonable opportunity to prevent that harm and successive harm described below, but she chooses not to act or intervene.

19.     Officer Parris does not say that Jeremy is being arrested for public intoxication. Officer Parris does not say that Jeremy is going to jail.  Officer Parris dies not tell Jeremy to put his hands behind his back.  Officer Parris does not say that Jeremy will be handcuffed.  Officer Parris does not tell Jeremy to turn around.  Officer Parris does not tell Jeremy that Officer Parris will physically turn Jeremy around.  In fact, Officer Parris does not command Jeremy to do anything.  He does not educate Jeremy at all about what he wants Jeremy to do, or what Officer Parris intends to do.  This is completely contrary to what any reasonable police officer would do. Officer Alcocer does not intervene, even though she has the authority and physical ability to do so, and she likewise does not provide any instruction, direction, or information to Jeremy.

20.     Officer Parris is threatening Jeremy with an improper and false arrest, and presumably ultimately false prosecution, for being publicly intoxicated.  Jeremy is not intoxicated. Officer Parris does so, so that Jeremy will provide his wallet to him, and Officer Parris could look through it based on the pretext of seeking identification when he is instead unlawfully looking for contraband.

21.     Therefore, Jeremy need not take any action at this point, and he has no reason to believe that he is under arrest, will be handcuffed, will be arrested, needs to turn around, needs to put his hands behind his back, or will be manhandled.  Instead, it is clear to any reasonable observer, including all reasonable police officers, and Officer Alcocer, that Officer Parris's question is stated to get what he had demanded that Jeremy give him – Jeremy's wallet.  Officer Parris does so even though he has no right to Jeremy's wallet, and Jeremy has no legal obligation

to provide an identification card to Officer Parris. Officer Alcocer knows this. Jeremy is not under arrest.

22.     Moreover, Officer Parris's statement and actions do not indicate to Jeremy that he is under arrest, or that Jeremy should put his hands behind his back, or otherwise take any physical position that is required for Officer Parris to arrest him. Jeremy evidences his understanding that he is not under arrest, or being arrested, because he responds with a question stating in substance something like, "Why? I didn't step outside of these boundaries." Officer Parris and Jeremy are simply having a conversation. Jeremy is shocked by what happens next.

23.     Officer Parris immediately physically assaults Jeremy, without notice, and without uttering another word. He moves quickly towards Jeremy and grabs, with his left hand, Jeremy's right wrist. He also, with an open palm, touches the left side of Jeremy's face/head and grabs the left side of Jeremy's neck and/or head. Jeremy, reacting as any person would to being assaulted, extends his right hand toward Officer Parris and holds the outside of Officer Parris's forearm with his left hand to stop the offensive physical contact of Officer Parris's right hand with Jeremy's head/neck. He does not do so to assault Officer Parris, but rather as a natural reaction to being assaulted. He does so to defend himself, as would anyone in Jeremy's position. Citizens are not required to simply stand still while being assaulted by a police officer. Officer Alcocer chooses not to intervene, even though she has the authority and physical ability to do so.

24.     Officer Parris then slugs Jeremy with his right fist, making contact with the right side of Jeremy's face. Jeremy's body is violently thrown backward, and he falls, striking the back of his head and/or neck on the truck bumper. Jeremy is stunned, shocked, and surprised, both at what Officer Parris did and as a result of being slugged and subsequently banging his head on the pick-up truck bumper. Officer Alcocer chooses not to intervene, to stop Officer Parris's continued

unconstitutional actions, but she instead joins in attempts to arrest Jeremy, and ultimately succeeds in her assistance to Officer Parris to effect that arrest.

25.     Officer Parris knows that, if he chooses to hit Jeremy, it is likely that the momentum of such a hit will cause Jeremy to hit the back of the tailgate and/or the bumper with the back of Jeremy's head – just as occurred.  Jeremy ends up being in a seated position on the concrete driveway, with his back close to and/or against the pick-up bumper, with officer Parris hovering over him getting ready to potentially hit Jeremy again.  Officer Alcocer chooses not to intervene, to stop Officer Parris's continued unconstitutional actions, but she instead joins in attempts to arrest Jeremy, and ultimately succeeds in her assistance to Officer Parris to effect that arrest.

26.     Officer Parris then says in substance, "Don't push on me."  Jeremy responds in substance, "I didn't push on you, dude."  Jeremy then, stunned and surprised as to what was happening, slowly crawls to his left to try to regain his balance while trying to avoid a likely second assault by Officer Parris.  Officer Parris continues to assault Jeremy.  Officer Alcocer chooses not to intervene, to stop Officer Parris's continued unconstitutional actions, but she instead joins in attempts to arrest Jeremy, and ultimately succeeds in her assistance to Officer Parris to effect that arrest.

27.     Jeremy's body is face–down at this point, and Officer Parris grabs the bicep portion of Jeremy's right arm.  Officer Parris gets on top of Jeremy, who has turned to be somewhat face–up and pulled his hands up towards his face to protect himself from an anticipated blow from Officer Parris.  Officer Parris then, upon information and belief, slugs Jeremy with his left fist to the right side of Jeremy's head and/or face.  Officer Parris is at this point generally on top of Jeremy, while Jeremy is on the ground.  Jeremy is told at some point to turn over.  Jeremy is confused and yelling out, because he has done nothing deserving being assaulted.  Jeremy is yelling

for Officer Parris to get off of him.  Office Alcocer, who has plenty of time to intervene, but who chooses not to do so, does not save Jeremy from the continued assault.

28.     Upon information and belief, Officer Parris, through a microphone on his uniform, notifies other units in the area, in substance, "We've got one fighting."  Jeremy then yells in substance, "I am not fighting! I am not fighting!" as he is being assaulted by Officer Parris for no reason.  Officer Alcocer does not come to Jeremy's aid, and she does not stop Officer Parris, even though she has the ability to do so.

29.     Jeremy does not deserve, constitutionally or otherwise, the treatment he is receiving.  Officer Parris's notification that he has someone who was fighting is akin to what some officers unfortunately learn to do when they are assaulting someone, to later create a purported defense – keep telling a person who is being assaulted to "stop resisting."  Some officers do this, because it looks good in video recordings later, even if the person is not really resisting.

30.     Jeremy yells, "Get off me!"  Officer Parris then, after some commands to Jeremy, which Jeremy is not comprehending due to blows to his head and being assaulted, chooses to Tase Jeremy.  Jeremy screams out in pain, as would anyone.  Officer Parris tells Jeremy to put his hands behind his back.  This is a convenient command.  When someone is being assaulted, as Jeremy is, the last natural thing a person would do is put his or her hands behind his back.  Any person in Jeremy's position would want to defend himself against the unwarranted and unconstitutional frontal attack.  This, combined with Jeremy's stunned state as a result of the blows to the head, should have caused Officer Parris, and would cause all reasonable police officers in his position, to attempt to deescalate the situation.  Rather than de-escalating anything, Officer Parris continues assaulting Jeremy.  Jeremy continues to cry out, loudly, in pain.  Officer Alcocer chooses not to help Jeremy, but she continues assisting Officer Parris to effect the unlawful arrest.

31.     After Jeremy is ultimately handcuffed, while Jeremy continues to cry out in pain, Officer Parris begins to try to create his alibi – on video – by telling Jeremy he is going to explain to him why he did what he just did.  Officer Parris, as the powerful police officer, both in position and with his ability to subdue suspects through his training and experience, as well as the weapons he carries on him, is going to explain to the assaultee why the assaultee deserves what he received. Any explanation at that point was useless.

32.     A man exits the house and asked in substance, "What happened?"  The man is very respectful, and he has a normal conversation with Officer Parris.  At some point the man says, "bro" in a respectful manner.  Officer Parris, intoxicated by his power as a police officer, says, "Listen, there is no bro.  You can call me sir.  Understand?"

33.     At one point, after several minutes, after Jeremy had been handcuffed and the scene had calmed down a bit, Jeremy asks in substance, "I'm getting arrested for this?"  Officer Parris responds, "Yes, you are definitely going to jail.  Yes sir."  Officer Parris has an opportunity to come to his senses, not arrest Jeremy, not take him to jail, and not have him prosecuted.  Officer Parris chooses not to do so.  Officer Alcocer also can stop the arrest at that point, and tell Jeremy and/or Officer Parris that the arrest will not occur.  She chooses not to do so, even though she has an opportunity to prevent the arrest.

34.     Officer Parris and the man who had exited the residence conversed occasionally during this time period while the man who exited the residence generally stayed near the front right tire of the pick-up.  Officer Parris would have been, upon information and belief, at least 25 feet or so away from the man during these conversations.  Officer Parris then tells the man to go inside, or he is going to go to jail for interference.  The man apparently goes back into the home.

35.     A few minutes before those conversations, upon information and belief, two other uniformed officers appeared at the scene.  Jeremy expresses to Officer Parris that he had not done anything wrong.  EMTs are called to the scene to remove Taser prongs from Jeremy.  Officer Parris had created quite a scene, when it was completely unnecessary and unreasonable.  Officer Parris admits to an EMT that Jeremy had been hit at least two times.  The EMT asks Officer Parris if he is okay, and he responds in substance, "I am fine."  He does so even though he indicated in documents later, with the intent to prosecute Jeremy, that he had experienced pain when Jeremy allegedly shoved him in the chest.  Officer Parris was clear to the EMT that he did not need any medical treatment.

36.     Officer Parris, before he left the scene, explains either to another police officer or an EMT, that he grabbed Jeremy allegedly to turn him around and then "boom!  He just shoved . . . ."  Officer Parris then says in substance "No, it isn't gonna happen."  Officer Parris would not have his authority questioned, and he decided as much as soon as Jeremy had asked about probable cause.  Officer Parris does not, of course, tell the person that he had not even told Jeremy that he was under arrest, or that he was going to handcuff him, and/or that he was going to transport him to any jail.

37.     An EMT then explains to Officer Parris in substance that Jeremy "has got some pretty good lacerations to his ear," and that she did not think that the jail would take him.  The EMT explains in substance the same thing to Officer Alcocer, whom Officer Parris indicates is his supervisor.  This demonstrates Officer Alcocer's ability, through her being Officer Parris's supervisor, to prevent harm to and arrest of Jeremy.  However, Officer Alcocer continues choosing not to act and/or help Jeremy.  Instead, in addition to assisting with the arrest, she assists with prosecution of Jeremy.

38.     Officer Parris then mentions at the scene to, upon information and belief, Officer Alcocer and one other officer that Jeremy would be charged with Public Intoxication, resisting arrest, and assaulting a police officer.  Photos were taken of Officer Parris's hands by another police officer.

39.     Officer Parris rides along in the ambulance with Jeremy when Jeremy is taken to the hospital.  An EMT asks Jeremy whether he wants a cold pack for his head, and Jeremy responds that he does.  The EMT tapes to Jeremy's head what appears to be the cold pack due to Jeremy being in pain.

40.     Officer Parris leaves the scene without securing the Taser cartridge.  Officer Parris knows that the Taser cartridge would be evidence and should have been secured, kept, and likely tagged.  Thus, to the extent Officer Parris disposed of or failed to secure any Taser evidence related to this case, the court should provide an appropriate spoliation remedy.  Officer Parris later admits to a fellow officer in the hospital emergency department, while waiting for Jeremy to receive treatment, that Jeremy was "fully compliant" when being asked to put his hands on to the tailgate of the truck just prior to Officer Parris searching Jeremy.  This is Officer Parris's admission that he need not have shoved Jeremy in the back when he did, but instead had done so simply to show his power and be aggressive and unreasonable.

41.     Medical records indicate as Jeremy's chief complaint: "Head Trauma."  Records also indicate that Jeremy had a closed head injury, and a laceration of the helix of his right ear.  Records indicate that the laceration was 2 centimeters in length.  His ear is sutured, and he is instructed to return to the emergency department for suture removal in 5–7 days.  Jeremy also undergoes CT scans of his head and cervical spine, as well as an x–ray of his knee, due to Officer Parris's assault.

42.     On or about July 24, 2018, Jeremy seeks medical treatment for eye trauma resulting from the assault by Officer Parris.  He indicates that he has been experiencing twitching of the right upper eyelid since approximately June 13, 2018.  He also indicates that he has issues with his vision – a problem with downward gaze.  He also feels a lump in the right upper eyelid, outer aspect.

43.     Jeremy suffers damages including but not necessarily limited to:

- past physical pain;

- any future physical pain;

- past mental anguish;

- future mental anguish;

- past physical impairment;

- any future physical impairment;

- medical and healthcare expenses incurred (paid plus owed) in the past;

- any medical and healthcare expenses that in reasonable probability will be incurred in the future;

- past disfigurement; and

- future disfigurement.

Jeremy also suffers economic damages, mental anguish, and emotional distress from the resulting prosecution of him at Officer Parris's behest.

D.     Officer Parris's and Officer Alcocer's Training

44.     Upon information and belief, all of Officer Parris's training related to being a law enforcement officer has been reported to the Texas Commission on Law Enforcement ("TCOLE").  According to TCOLE, Officer Parris became a licensed peace officer in December 2012.  He then

served as a police officer for the Galveston Police Department until approximately August 2015.

He then served again as a Galveston Police Officer from approximately December 2015 until

September 2017.  He then moved to Hutto, Texas to work for the Hutto Police Department, upon

information and belief, because he was recruited by and/or learned about a position with the Hutto

Police Department from Hutto Chief of Police Byron Frankland.

45.     TCOLE records indicate that Officer Parris received training including the

following:

| Course No. | Course Title | Course Date | Course Hours | Institution |
| --- | --- | --- | --- | --- |
| 2176 | S.F.S.T. NHTSA 24 Hour Practitioner - BPOC | 11/16/12 | 0 | College of the Mainland LEA |
| 1000 | Basic Peace Officer | 12/06/12 | 769 | College of the Mainland LEA |
| 3344 | Less Lethal Electronic Control Device Training | 01/02/13 | 8 | Galveston Police Department |
| 3343 | Less Lethal Chemical Weapons Training (OC, Mace . . . ) | 01/11/13 | 4 | Galveston Police Department |
| 2053 | Baton (All) | 01/16/13 | 8 | Galveston Police Department |
| 3722 | Peace Officer Field Training | 04/30/13 | 160 | Galveston Police Department (Training Rosters) |
| 77310 | PoliceOne – Crowd Control 1 | 06/23/15 | 1 | Praetorian Group – Police One |
| 3702 | Field Training Officer | 09/08/16 | 24 | Galveston Police Department (Training Rosters) |
| 2095 | Use of Force (Non-Intermediate Core Course) | 09/26/17 | 1 | Praetorian Group – Police One |
| 2178 | S.F.S.T. Practitioner Update | 10/25/17 | 8 | Texas Municipal Police Association |
| 2096 | Arrest, Search & Seizure (Non-Immediate Core . . . ) | 11/22/17 | 1 | Praetorian Group – Police One |
| 3039 | Conflict Resolution | 11/22/17 | 1 | Praetorian Group – Police One |
| 3396 | Patrol/Tactical Seminar | 04/17/18 | 10 | Williamson County Sheriff's Office Academy |

Upon information and belief, every above-listed course, other than Course Numbers 2178 and 2176, were courses in which Officer Parris learned how to use appropriate and/or reasonable force, as well as Fourth Amendment constitutional limitations on use of force.  Moreover, upon information and belief, when taking at least Course Numbers 2176 and 2178, as well as likely one or more other courses not listed above but which appear in Officer Parris's TCOLE record, Officer Parris learned standardized field sobriety testing ("SFST").  Upon information and belief, he learned at least the following standardized field sobriety tests:

- Horizontal Gaze Nystagmus (involuntary jerking of the eyes);

- Walk-and-Turn; and

- One-Leg Stand.

Upon information and belief, he also learned the following field sobriety tests, which may not be, or in the alternative are not, standardized:

- Alphabet (requires a person to cite part of the alphabet, beginning with any letter other than A, and ending on a letter other than Z);

- Count-Down (requires a person to count backwards, never using numbers that end with a 5 or 0); and

- Finger-Count (requires a person to touch the tip of the person's thumb to the tip of each finger on the same hand while simultaneously counting up 1, 2, 3, 4, then reversing direction counting down.

46.    Upon information and belief, Officer Parris learned that the Horizontal Gaze Nystagmus test is deemed the most reliable field sobriety test, and that it begins with a person's left eye.  Upon information and belief, he also learned that the maximum number of clues is six, and only three clues can appear in each eye.  Further, upon information and belief, Officer Parris

learned that the Horizontal Gaze Nystagmus test is approximately 77% accurate, the Walk-and-Turn test is approximately 68% accurate, and the One-Leg-Stand test is approximately 65% accurate.  Therefore, upon information and belief, Officer Parris had the tools to determine for himself a reasonable belief, and more importantly probable cause, as to whether Mr. Rogers was intoxicated.  He chose not to use any of these tests, but instead to arrest, threaten to arrest, and/or suggest that he would arrest Jeremy for public intoxication.  Officer Parris chose not to use any of these tests for other reasons set forth in this pleading.  Regardless, Jeremy was not intoxicated at the time he was detained and/or arrested, and he did not, as the Texas statute regarding public intoxication required, present a danger to himself or others.

47.     Upon information and belief, Officer Alcocer, who had been a police officer since approximately November 2001, had knowledge and training similar to, or likely far exceeding, that of Officer Parris described above and regarding the topics above.  Thus, she likewise knew of the constitutional violations occurring when she chose to do nothing to assist Jeremy.  Instead, she participated in the arrest and prosecution of Jeremy.

48.     Interestingly, after Officer Parris assaulted and wrongfully caused Jeremy to be prosecuted, TCOLE issued a letter of reprimand against him, for failing to complete legislatively-required minimum standards for continuing education for the unit or cycle ending September 30, 2017.  TCOLE also noted that, if Officer Parris received three reprimands, he would be subject to license suspension.



Kim Vickers
Executive Director

# TEXAS COMMISSION ON
# LAW ENFORCEMENT

June 12, 2018

PID:

Gregory R. Parris

via CM/RRR # 7017 3380 0001 1597 1588

Re: Reprimand No. 18-02-000988 RP, Gregory R. Parris, Hutto Police Dept.

Dear Gregory R. Parris

This letter of reprimand is being issued because Texas Commission on Law Enforcement (TCOLE) records show you did not complete the legislatively required minimum standards for continuing education.

Specifically, you did not complete your required continuing education training during the training unit or cycle ending September 30, 2017. This is a violation of TCOLE statutes and rules. *See* Tex. Occ. Code §§ 1701.351, .352, .353; 37 Tex. Admin. Code §§ 218.3; 223.15(f).

**Please note, a licensee with three reprimands is subject to license suspension. *See* 37 Tex. Admin. Code § 223.15(g). Importantly, third-time noncompliance with continuing education standards will result in license revocation. *See* 37 Tex. Admin. Code § 223.19(d).**

If this letter has been issued in error, please provide supporting documentation to TCOLE's Enforcement Division within ten business days.

Sincerely,

Michael Antu

Director, Enforcement Division

Phone: (512) 936-7700      Fax: (512) 936-7714          6330 E Highway 290 STE 200 Austin TX 78723-1035

E.    Hutto Police Department Use of Force Policies

49.    A police officer's failure to comply with his or her department's policies can be evidence that a constitutional violation occurred.  Hutto Police Department policy, as of May 31, 2018, was generally "that officers use only the force that is reasonably necessary to effectively bring an incident under control, while protecting the lives of officers and others."  The policy also indicated that, under normal circumstances, only certain methods or instrumentalities could be used to apply force.  Those methods were listed in ascending order – from the least severe to the most severe:

- Physical presence.
- Verbal direction.
- Soft empty-hand techniques (pressure points, escort takedowns, etc.).
- O.C. spray.
- Taser (EDD).
- Hard empty-hand techniques (stuns, strikes, kicks, etc.).
- Impact weapons/less lethal projectiles.
- Approved firearm.

Thus, the first two things Officer Parris should have used to gain control of the situation, if any were necessary (which Plaintiff denies), would have been his physical presence and his verbal direction.  He could have then used soft empty hand techniques and, if such did not work, O.C. spray.  Instead, Officer Parris chose to skip using both soft empty hand techniques and O.C. spray and jump directly to use of hard empty–hand techniques and a Taser.  This was a violation of Hutto Police Department policy and some evidence that Officer Parris was violating, and knew he was violating, Jeremy's constitutional rights.

F.    Officer Parris Causes Improper Prosecution of Jeremy

50.    Officer Parris caused an improper and unreasonable prosecution of Jeremy.  Officer Parris's incident report indicated three offenses committed by Jeremy: (1) Resist Arrest Search or Transport; (2) Assault Public Servant; and (3) Public Intoxication.

**INCIDENT/INVESTIGATION REPORT**

| | |
|---|---|
| Case# | 1805310007 |

**I N C I D E N T   D A T A**

| Agency Name | *Hutto Police Dept* |
|---|---|

Date / Time Reported *05/31/2018  22:09  Thu*
Last Known Secure *05/31/2018  22:09  Thu*
At Found *05/31/2018  22:09  Thu*

| ORI | *TX2460400* |
|---|---|

| Location of Incident | *400-BLK Paige Bnd, Hutto TX 78634-* | Premise Type *Highway / Road / Alley /* | Zone/Tract PCT4, HUS |
|---|---|---|---|

| #1 | Crime Incident(s) *Resist Arrest Search Or Transport* *PC 38.03 (A)* | (Com) M | Weapon / Tools | | | Activity |
|---|---|---|---|---|---|---|
| | | | Entry | Exit | Security | |
| #2 | Crime Incident *Assault Public Servant* *PC 22.01 (B)(1)* | (Com) F | Weapon / Tools *Personal Weapons* | | | Activity |
| | | | Entry | Exit | Security | |
| #3 | Crime Incident *Public Intoxication* *PC 49.02* | (Com) M | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |

**MO**

**VICTIM**

| # of Victims  *2* | Type:  SOCIETY / PUBLIC | | Injury: | | | | | |
|---|---|---|---|---|---|---|---|---|
| V1 | Victim/Business Name (Last, First, Middle) *The Great State Of Texas* | Victim of Crime # *3* | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| Home Address | | | | | | | Home Phone | |
| Employer Name/Address | | | | | | Business Phone | Mobile Phone | |
| VYR | Make | Model | Style | Color | Lic/Lis | | VIN | |

**OTHERS INVOLVED**

CODES:  V- Victim (Denote V2, V3)   O = Owner (if other than victim)    R = Reporting Person (if other than victim)

| Type:   INDIVIDUAL | | Injury:  None | | | | | |
|---|---|---|---|---|---|---|---|
| Code V2 | Name (Last, First, Middle) *PARRIS, GREGORY* | Victim of Crime # *1,2* | DOB *1986* Age *31* | Race *W* | Sex *M* | Relationship To Offender *1ST* | Resident Status *Resident* | Military Branch/Status |
| Home Address | | | | | | | Home Phone | |
| Employer Name/Address | | | | | | Business Phone | Mobile Phone | |

| Type: | | Injury: | | | | | |
|---|---|---|---|---|---|---|---|
| Code | Name (Last, First, Middle) | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| Home Address | | | | | | | Home Phone | |
| Employer Name/Address | | | | | | Business Phone | Mobile Phone | |

**PROPERTY**

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Officer/ID# | *PARRIS, G. (HPD0086)* | | |
|---|---|---|---|
| Invest ID# | *(0)* | Supervisor | *ALCOCER, J.  (PAT) (HPD0081)* |
| Status | Complainant Signature | Case Status *Pending/active    05/31/2018* | Case Disposition: |

Page 1

Sys#: 475513                    06/07/2018 11:00:10

51.     Officer Parris also wrote in a narrative, which he knew would be used in conjunction with the incident report for prosecution of Jeremy:

> The male asked if I had probable cause and I suggested to him he would be placed under arrest for Public Intoxication.  I then decided to place him under arrest for Public Intoxication and began to turn him around to affect [sic] my arrest at which time he quickly and violently shoved me in my chest, partially knocking me off balance and causing pain to my chest.

Officer Parris falsely alleges that he "suggested" that Jeremy would be placed under arrest for Public Intoxication.  Instead, Officer Parris had asked a question about Public Intoxication (as otherwise alleged herein).  Officer Parris admits that did not make a decision to arrest Jeremy for Public Intoxication after he had asked that question.  This is Officer Parris's admitted, subjective evidence that his question to Jeremy was in fact a question – not a statement that he was in fact arresting Jeremy for Public Intoxication.  This is clear, additional evidence that Jeremy had no reason to believe that he was being arrested at the time Officer Parris chose to assault him.  Moreover, as also alleged elsewhere herein, Officer Parris did not communicate his mental decision to anyone, most importantly Jeremy, so that Jeremy would know what was happening.  He did not, as he indicates in the quotation above, "begin to turn him around."  Instead, he grabbed Jeremy as alleged elsewhere herein.  Therefore, Officer Parris provided misleading and false information for prosecution of Jeremy.

52.     Officer Parris also indicates in his narrative that he struck Jeremy with a hard-hand technique three times, the first of which when he knocked Jeremy's head into the pick-up bumper.  Officer Parris also writes that Jeremy was being charged with Public Intoxication "for fear that if left alone in his intoxicated state he would pose a danger to himself or others."  This was false.  Jeremy was not intoxicated, and he was doing nothing that would pose a danger to himself or anyone else.  He was not slurring his words and did not have trouble standing.  Instead, he was

standing on a driveway, on private property, past the sidewalk, and relatively far from the street. He was doing nothing more than many people do in Texas, on a nightly basis, when standing in their front yard or on their driveway. There were also no other people around which Jeremy had threatened or threaten to assault, or do anything to, due to allegedly being intoxicated. This false information was used when prosecuting Jeremy. This report was dated May 31, 2018 at 10:09 p.m., but the date and time at the bottom of the page is listed as June 7, 2018 at 11:00.

53.     Officer Alcocer also completed a case supplemental report which was used to prosecute Jeremy. In it, she writes, "Officer Parris advised the subject he was going to jail for public intoxication." She wrote this statement, in a chronological narrative describing the portion of the incident which occurred just after Jeremy asked about probable cause. Thus, the statement was patently false. The statement was also used in prosecution of Jeremy. She did admit that "Officer Parris reached in to grab the subject's arm and head . . . ." Interestingly, Officer Alcocer had also been hired away from the Galveston Police Department, and she had started working for Hutto Police Department on June 5, 2017. It seems much more than a coincidence that so many officers were hired away from Galveston Police Department, considering that the Galveston Police Department and Hutto Police Departments are relatively small as compared to other police departments in Texas.

54.     Officer Parris changed his story when he swore out a misdemeanor complaint to have Jeremy prosecuted. Instead of asserting what was indicated above regarding possibly arresting Jeremy, he wrote, "I then informed the male he was under arrest for Public Intoxication and I began to turn him around to affect [sic] my arrest . . . . " Officer Parris never told Jeremy that he was under arrest for Public Intoxication. Thus, the statement was false and deceiving, and was presented to, upon information and belief, one or more prosecutors to have Jeremy prosecuted.

Officer Parris made the same allegation in a felony complaint/affidavit. Upon information and belief, that felony complaint/affidavit was also used by prosecutors and/or one or more other persons to prosecute Jeremy. This information was false and/or deceptive. Jeremy was innocent of all of the alleged crimes with which he was charged, and there was no probable cause to arrest him.

G.      *Monell* Liability Facts

55.   Hutto is liable for all damages suffered by Jeremy and referenced in this pleading pursuant to *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978) and its progeny. Such liability arises due to the action and/or inaction of the chief policymaker for Hutto regarding material issues in this case. The chief policymaker was the Chief of Police (or his predecessor and/or successor). In the alternative, the chief policymaker was another person with managerial authority and, obviously, authority to make policies and procedures to be used by Hutto police officers. Plaintiff need not, pursuant to Fifth Circuit authority, name the actual policymaker at the pleading stage. Plaintiff is informed and believes that, through discovery, Plaintiff will identify with certainty the applicable chief policymaker. Hutto's action and inaction otherwise referenced in this pleading, related to damages suffered by Jeremy, and Hutto's policies, practices, and/or customs, were moving forces behind, resulted in, were producing causes of, and were proximate causes of the referenced constitutional violations and damages suffered by Jeremy as a result. This paragraph is incorporated by reference into all paragraphs below within this "*Monell* liability facts" section, as well as sections below asserting causes of action against Hutto.

1.   Hutto's Policy, Practice, and/or Custom of Not Conducting Field Sobriety
Tests was a Moving Force Behind and Caused Jeremy's Damages

56.     Hutto once had in place a policy requiring its police officers to conduct field sobriety tests.  However, it chose to repeal that policy and thereby allow its police officers to arrest people for public intoxication without performing a field sobriety test.  Thus, Hutto chose to have a policy which would not require police officers to use any of the elements of a field sobriety test to determine whether a person is intoxicated.

57.     It is impossible to determine whether a person is intoxicated without using a field sobriety test.  A police officer cannot simply look at a person and determine that he or she is intoxicated, thus allowing arrest for intoxication (if the other elements of the relevant statute are met).  There is a reason for a field sobriety test.  It allows an officer to use standardized tests to form what would be a reasonable belief as to whether a person is – or is not – intoxicated, and ultimately potentially probable cause regarding any such intoxication.  An officer cannot form probable cause without conducting such standardized testing.  A person could act in a certain manner because he or she hit her head, is having a seizure, or suffering numerous other maladies. Without performing field sobriety testing, an officer alleging that probable cause exists to arrest an allegedly intoxicated person does so based upon no reasonable determination.  In other words, probable cause could not exist for such an arrest without an officer conducting a field sobriety test.

58.     Thus, a Hutto police officer could not reach a reasonable conclusion about whether a person was intoxicated without using facts established through conducting a field sobriety test. Hutto knew information pled in this portion of this pleading when it chose to institute a policy of no field sobriety testing by police officers, when such officers were considering whether to arrest a person based upon an alleged public intoxication offense.  Despite Hutto's knowledge of this information, it chose to repeal a pre-existing policy requiring police officers whenever "possible

and practical" to do such field sobriety tests.  When Hutto did so, it chose to institute a new policy for its police officers – that of not conducting field sobriety tests of persons suspected of being publicly intoxicated.

### HUTTO POLICE DEPARTMENT STANDARD OPERATING PROCEDURES

NUMBER:    03.2013.6        SUBJECT:    Public Intoxication

| Date of Issue: | Effective Date: | Amends: | Rescinds |
|---|---|---|---|
| March 15, 2013 | March 15, 2013 | | Any Past Hutto PD Policies or Written Directives |

Peter Scheets
Approved by the Chief of Police

1. When a person is found to be intoxicated to the point that the person presents a danger to themselves or others, the appropriate enforcement option may be custodial arrest.  Nothing contained herein is intended to restrict or inhibit the release of an intoxicated person to a person or appropriate treatment facility that accepts responsibility for the intoxicated person and in accordance with the law.

2. ~~Whenever possible and practical to do so, such field sobriety tests are conducted in conjunction with all intoxication-related arrests.~~

3. When an officer arrests a person for public intoxication, or issues a citation for any other alcohol-related Class C misdemeanor or city ordinance violation, he/she will photograph any alcoholic beverage in the possession of the person at the time of the arrest or citation.

59.    The crossed–out, repealed policy reads, "Whenever possible and practical to do so, such field sobriety tests are conducted in conjunction with all intoxication-related arrests."  It was obvious to Hutto and the relevant chief policymaker that repealing the field sobriety test policy would result in people who are not intoxicated, and who are not a danger to themselves or others, being arrested and improperly prosecuted.  The decision to repeal that policy, and thereby the

decision to create a policy of not conducting field sobriety tests, in light of this obvious knowledge, was deliberate indifference to the rights of people who would come into contact with Hutto police officers, including Jeremy.  The result of repealing that policy, and thereby creating a policy of not conducting field sobriety tests, was therefore obvious and foreseeable.  Hutto police officers would arrest and cause to be prosecuted people who were not in fact intoxicated, and who were not a danger to themselves and/or others.

60.     The decision by Hutto to repeal this policy, and thereby create a policy of not conducting field sobriety tests, was a moving force behind, caused, and proximately caused all damages referenced in this pleading.  The decision to repeal the policy, and thereby created policy of not conducting field sobriety tests, equated to recklessness and more, and it would result, to a moral certainty, to false and improper arrests and improper and/or malicious prosecutions.  This would cause, and in Jeremy's case did cause, violations of Fourth Amendment and Fourteenth Amendment rights.  Jeremy was not intoxicated, and conducting a field sobriety test would have determined as much.

### 2.     Hutto's Unwritten Policy, Practice, and/or Custom of Using Excessive Force was a Moving Force Behind and Caused Jeremy's Damages

61.     Upon information and belief, Hutto's policy, practice, and/or custom of using excessive force was a  moving force behind and caused Jeremy's damages.  This unwritten policy, practice, and/or custom was demonstrated by more than one type of evidence, as is shown below in this section of this pleading.

62.     Upon information and belief, Hutto failed to appropriately discipline Officer Parris and/or Officer Alcocer as a result of the unconstitutional seizure, use of force, subsequent prosecution of Jeremy, retaliation, and other constitutional violations alleged herein.   Upon

information and belief, Officer Parris was not given any or sufficient time off without pay, was not materially disciplined, was not significantly reprimanded, was not instructed to act in any appreciably different manner in the future, and was not instructed to participate in any additional training and/or education.  Upon information and belief, after assaulting Jeremy, Officer Parris was not put on light or administrative duty but was instead allowed to continue to wear a firearm and drive a Hutto Police Department marked vehicle.  Further, upon information and belief, Officer Parris was even allowed to teach TCOLE defensive tactics after assaulting Jeremy.  Further, upon information and belief, Officer Parris would actively show the video of his assault of Jeremy to other police officers in the Department as if bragging about what he had done.

63.     Further, upon information and belief, when Chief Byron Frankland learned that the Texas Rangers would investigate the assault of Jeremy, Chief Frankland said, "F_ _ _ 'em!"  Upon information and belief, Chief Frankland used the expletive to express his total lack of concern about oversight of Hutto's police department, and his belief that he could run the Department in any manner he chose to run it.  Further, upon information and belief, such a statement was made to show Chief Frankland's support and approval of the manner in which Officer Parris and Officer Alcocer had conducted themselves regarding the assault, arrest, and prosecution of Jeremy.  Thus, the chief policymaker for police matters confirmed, through the use of an expletive, Hutto Police Department policy, practice, and custom.

64.     Hutto had plenty of evidence – more than sufficient to be presented to a grand jury – regarding Officer Parris's actions.  Even so, after review of all such evidence, contrary to any reasonable analysis, upon information and belief, Hutto chose to do nothing materially significant to Officer Parris.  Upon information and belief, the Williamson County District Attorney's office

referred Officer Parris's assault of Jeremy to the Texas Rangers for investigation, because it

realized that Officer Parris had engaged in unlawful and improper actions.

**REPORT OF INVESTIGATION**                                              Page 1 of 32

## TEXAS DEPARTMENT OF PUBLIC SAFETY
## TEXAS RANGERS

| THIS REPORT IS THE PROPERTY OF THE TEXAS RANGERS. NEITHER IT NOR ITS CONTENTS MAY BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED. | | | |
|---|---|---|---|
| LEAD INVESTIGATOR: | GARY PHILLIPS | INVEST#: | 2018I-TRF-50027022 |
| SUPERVISOR: | JAMES THOMAS | OPENED: | 07/20/2018 |
| TITLE: | AGGRAVATED ASSAULT/WILLIAMSON COUNTY/JEREMY ALAN ROGERS | FILE STATUS: | OPEN |
| TYPE: | CRIMINAL | DIVISION: | TEXAS RANGERS |
| SERVICE: | | REGION: | F |
| DISTRICT: | | AREA: | |
| SUBTYPE: | ASSAULTIVE OFFENSES (INCLUDING SEXUAL ASSAULT) | SPURS URN: | CMIV50027022 |
| CATEGORY: | | REVIEW DATE: | 04/21/2019 |
| SPECIAL APPROVAL: | | LEGACY REF: | |
| PROGRAM: | CRIMES AGAINST PERSON | SUBPROGRAM: | FELONY |
| CASE#: | | | |

**INVESTIGATION SYNOPSIS**

On 07-19-2018, I, Texas Ranger Gary Phillips initiated an investigation regarding an alleged
aggravated assault that occurred in the City of Hutto, Williamson County, Texas on 05-31-
2018.

Hutto should have and could have done likewise, but it chose not to do so, upon information and

belief, because of its, upon information and belief, unwritten policy, practice, and/or custom of

using excessive force.

65.     Allegations above about what Hutto did and/or did not do regarding Officer Parris

and/or Officer Alcocer after Officer Parris chose to assault Jeremy are not allegations that *Monell*

liability arises solely as a result of Hutto failing to appropriately supervise, train, and/or discipline

Officer Parris and/or Officer Alcocer, and/or that such failure was a moving force behind and

proximately caused constitutional violations and damages set forth in this pleading.  Instead, those

allegations demonstrate evidence of a policy, practice, and/or custom of using excessive force that

pre-existed the assault, improper arrest, and improper prosecution of Jeremy.

66.     Likewise, Chief Frankland's lack of remorse, and instead response to a Texas Rangers investigation by saying "F_ _ _ 'em" demonstrated a pre-existing policy of using excessive force, and a complete lack of care by the chief policymaker of the City of Hutto, for the Hutto Police Department using such force.  All reasonable police chiefs would take very seriously an investigation by the Texas Rangers into actions of a police officer under his or her supervision. Chief Frankland, not acting as a reasonable police chief, confirmed the policy, practice, and/or custom of Hutto for using excessive force.

67.     Further, Upon information and belief, the unwritten policy, practice, and/or custom was also demonstrated by Chief Byron Frankland's decision to employ officers from his prior employer – Galveston Police Department, even after knowing that some such officers had serious issues with aggressiveness and/or use of excessive force.  Once such example, regarding Hutto Police Officer Evan Fraley, is quite instructive and troubling.  The fact that Chief Byron Frankland chose to hire Officer Fraley, after learning of the horrific nature of what he had done in Galveston, would alone show Chief Frankland's policy, practice, and/or custom of Hutto police officers using excessive force.

68.     Toni Collins, a Galveston, Texas resident, was a very small woman.  She was only approximately 5'-2" tall, and her weight would vary somewhat between approximately between 115 pounds and, at the time of her death, approximately 144 pounds.  She was noticeably smaller than an average adult and appeared so small physically, to at least one witness near the time of her death, that she looked like a child.

69.     Galveston Police Officer Fraley, in stark contrast to Toni, is a very large man.  He is 6'-8" tall, and he weighed at the time of Toni's death approximately 380 pounds.  Officer Fraley played college football for Eastern New Mexico University.  Officer Fraley was an offensive tackle

and, during some college years, weighed approximately 315 to 320 pounds. Upon information and belief, this was when he reached the peak of physical fitness, and he gained significant weight afterward.

70.     Officer Fraley also played football for four years at Montgomery High School. Upon information and belief, he likely played football even before then. Regardless, Officer Fraley, for years, as a result of playing football, including related training, physical exertion, and workouts, knocked down men as large if not larger than him. He played a sport – and a position – which prides itself on physical aggressiveness and the ability to slam large men to the ground. Officer Fraley, through his experiences playing football, was well-aware of his physical superiority and ability to physically subdue someone his size, much less someone weighing less close to 140 pounds.

71.     Aside from Officer Fraley's extensive football experience in literally physically knocking down men as large as himself, many times, over several years, he also received training through the police academy and continuing law enforcement education as to how to fight and subdue suspects. Officer Fraley received particularized training related to fighting and taking down suspects – ensuring that people would not harm him in the process. Thus, Toni, merely 5'-2" tall and weighing at most 144 pounds, was no physical match for Officer Fraley. More important, due to her small physical presence, she was no threat at all to Officer Fraley. Officer Fraley would not have had, and did not ever have, any fear that Toni could or would seriously harm him or anyone else.

72.     Upon information and belief, all of Officer Fraley's training related to being a police officer has been reported to the Texas Commission on Law Enforcement ("TCOLE"). According to TCOLE, Officer Fraley became a licensed peace officer in December 2013. Officer

Fraley had been a licensed peace officer only a little over 3 years at the time he shot and killed Toni. Officer Fraley was not awarded the basic peace officer certification until after Toni's death. He also did not receive the intermediate peace officer certification until well after Toni's death – on March 20, 2018.

73. Officer Fraley, in addition to all of the experience referenced above gained through football and law enforcement training regarding his ability to subdue large suspects, much less a 5'–2", approximately 140-pound woman, Officer Fraley received significant training related to the physical aspects of being a police officer. TCOLE records indicate that he received the following such training:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3340 | Crowd Control | 12/16/16 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 10/21/16 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 10/20/16 | 24 | Houston Police Academy |
| 3340 | Crowd Control | 09/23/16 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 08/19/16 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 07/29/16 | 4 | Galveston Police Department (Training Rosters) |
| 2055 | Firearms | 06/07/16 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 05/20/16 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 11/20/15 | 4 | Galveston Police Department (Training Rosters) |
| 2055 | Firearms | 11/11/15 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 10/30/15 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 09/23/15 | 24 | Houston Police Academy |
| 3340 | Crowd Control | 08/28/15 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 06/26/15 | 4 | Galveston Police Department (Training Rosters) |

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3340 | Crowd Control | 05/15/15 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 04/24/15 | 8 | Galveston Police Department (Training Rosters) |
| 3322 | Patrol Rifle | 01/31/15 | 16 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 01/23/15 | 8 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 01/17/15 | 40 | Houston Police Academy |
| 3340 | Crowd Control | 07/25/14 | 4 | Galveston Police Department (Training Rosters) |
| 3340 | Crowd Control | 05/30/14 | 4 | Galveston Police Department (Training Rosters) |
| 3722 | Peace Officer Field Training | 03/14/14 | 160 | Galveston Police Department (Training Rosters) |
| 3344 | Less Lethal Electronic Control Device Training | 01/03/14 | 8 | Galveston Police Department (Training Rosters) |
| 2053 | Baton (AI) | 12/30/13 | 8 | Galveston Police Department (Training Rosters) |
| 2055 | Firearms | 12/13/13 | 24 | Galveston Police Department (Training Rosters) |
| 1000643 | Basic Peace Officer Course (643) | 12/03/13 | 643 | College of the Mainland LEA |

74.     Officer Fraley shot and killed Toni, in the late afternoon, on March 9, 2017, in Galveston, Texas.  It was, as one witness said, "Unnecessary, uncalled-for, and unjustified."

75.     Toni was in an alley with a man named Victor Mangum.  She was holding what was clearly a pink Daisy B.B. gun/air rifle.  Toni was not threatening Mr. Mangum or anyone else with the B.B. gun but instead simply holding it.  Toni had no intent to shoot the B.B. gun at anyone, or harm anyone with it, and it was apparent from looking at her, considering the circumstances, that she was not a danger to anyone at the scene.  Toni was not pointing the B.B. gun at anyone or in the direction of anyone.

76.     Officer Fraley, learning of Toni's presence, sped to the scene in his personal vehicle and in plain clothes.  He was wearing shorts, flip-flops, and a dark shirt with a skull on the front.  Officer Fraley had just finished eating at a restaurant.  He stopped his vehicle abruptly and was with one or more family members.  Officer Fraley, though off-duty, was acting in the course and scope of his duties as a City of Galveston police officer, under color of state law.

77.     Officer Fraley did not identify himself as a police officer.  Even so, he pulled his pistol and ordered Toni and Victor to lay on the ground.  Victor laid on the ground, but Toni held out the B.B. gun and said in substance, "It's a Daisy B.B. gun."  One witness indicated that it looked like an "air puff gun."  Toni did not hold the gun out in a manner indicating that she intended to use it, or shoot it at anyone, but instead simply to show officer Fraley that it was something about which he needed not be concerned.  She displayed it so that he could see that it did not present a threat.  One witness indicated that Toni eventually dropped the B.B. gun as requesteed, while Officer Fraley would later indicate that he extracted the B.B. gun from Toni.  Regardless, and knowing that the B.B. gun was no longer in Toni's reach and was not a threat to him or anyone else, Officer Fraley threw Toni into a fence with great force.  Officer Fraley also pistol-whipped Toni.

78.     All material facts and allegations related to Officer Fraley's shooting and killing Toni are not included in this pleading.  Suffice it to say that, in substance, witnesses were confused when Officer Fraley was not arrested.  Witnesses generally concluded that Officer Fraley shooting Toni was unjustified and uncalled-for.  Considering their respective sizes alone, and the fact that Toni had, at most, according to Officer Fraley, a stick in her hand at the time of the shooting, the shooting was unreasonable and unjustified.  Another witness saw Toni fly through the air when Officer Fraley grabbed Toni and threw her like a rag doll into a fence.  This was clear

demonstration of Officer Fraley's physical superiority over Toni – and that there was no need to shoot to kill her.  It was unreasonable.

79.     After police officers arrived on the scene, a police officer gratuitously kicked Mr. Mangrum in his side.  He suffered abuse by that Galveston police officer.  That abuse was objectively unreasonable and a violation of Mr. Mangum's constitutional rights, and it was engaged in by one of Officer Fraley's co-workers.  This is shocking to say the least, when Mr. Mangum was doing nothing wrong, and the officer's co-worker had just shot and killed a small woman.

80.     Toni did not, at the time she was shot, present a threat of serious bodily harm to Officer Fraley or anyone else at the scene.  Toni was also not fleeing at the time.  Further, Toni had not been accused of committing any serious crime, simply possessing a B.B. gun within the City limits.  Toni had no violent or serious criminal history and, upon information and belief, no felony convictions.  Officer Fraley's actions were patently unreasonable.

81.     Upon information and belief, Galveston Assistant Police Chief Byron Frankland became police chief of the Hutto, Texas Police Department after Toni was shot and killed but before Officer Fraley obtained a new position with the Hutto Police Department.   Upon information and belief, Chief Frankland was sworn in on or about April 6, 2017, and Officer Fraley began working for Hutto Police Department on or about October 23, 2017.  Upon information and belief, Officer Fraley, who after killing Toni resigned from the Galveston Police Department, was able to secure a new position with the Hutto Police Department through new Hutto Chief of Police, Byron Frankland.  Further, upon information and belief, Hutto Chief Byron Frankland knew of this incident, including most of the material details.  Nevertheless, he chose to, upon information and belief, hire Officer Fraley to deal with people in the City of Hutto such as Jeremy.  A lawsuit

was filed against Officer Fraley and the City of Galveston as a result of Toni's death, and Officer Fraley's deposition was scheduled to occur at the Hutto Police Department. That lawsuit was settled, and therefore the deposition did not occur. Upon information and belief, Chief Frankland knew that the deposition was to occur at the Hutto Police Department, and he further knew the nature of the matters to be explored during that deposition. Further, upon information and belief, Officer Fraley continues to be employed by the Hutto Police Department.

82.      Upon information and belief, Officer Parris was also hired away from the Galveston Police Department through Hutto Chief of Police Frankland. TCOLE records indicate that Officer Parris began his employment with Hutto Police Department on September 25, 2017. Upon information and belief, Chief Frankland knew of issues Officer Parris had had with being overly aggressive related to policing Galveston. In or about August 2015, a formal investigation by the Galveston Police Department was opened against Officer Parris. On or about April 22, 2015, at approximately 4:40 p.m., Officer Parris was patrolling a certain area when he responded to an officer needing assistance. While responding, he disregarded a red light at an intersection while his view was obstructed by a school bus. He continued to travel west on the street through the intersection with speeds ranging from 47 miles per hour to 81 miles per hour in heavy traffic, and with a 35 mile per hour speed limit. When he approached another intersection, he turned south and nearly avoided a collision with a vehicle traveling with the right-of-way. He then began to travel south on a residential neighborhood street, with a posted speed limit of 30 miles per hour, with speeds topping out at 58 miles per hour. He then disregarded a stop sign at another intersection, and struck a vehicle which in turn struck a residence. He was traveling at approximately 53 miles per hour through the intersection when he disregarded the stop sign.

83.     History regarding Officer Parris was that, only approximately two years prior, he was in another police fleet crash.  Galveston police determined that crash was also preventable.

84.     One of the pertinent factual findings related to his second crash was: "Officer Parris failed to operate his police unit safely and within the confines of departmental rules, regulations, directives, and general orders by violating one or more."  The findings also indicated that Officer Parris had been suspended for the prior vehicle crash.  Ultimately, Officer Parris was suspended again – for 15 days for his reckless actions related to people and property.

85.     Upon information and belief, Chief Frankland was aware of these incidents and Officer Parris's suspension.  Regardless of that knowledge, upon information and belief, Officer Frankland chose to employ Officer Parris.

86.     Further, as to Officer Alcocer, Chief Frankland instructed Sergeant Conor Mitchell, when Sergeant Mitchell was conducting a background investigation of Officer Alcocer as the Professional Standards Sergeant for the Hutto Police Department, that Sergeant Mitchell need not conduct an investigation into Officer Alcocer's work habits, characteristics, and values.  Chief Frankland directed Sergeant Mitchell not to include those issues in his background investigation of Officer Alcocer, telling Sergeant Mitchell that such an investigation was "unnecessary" since Chief Frankland had worked with Officer Alcocer in Galveston.  Officer Alcocer was, as was determined through the limited investigation allowed by Chief Frankland, a respondent when an emergency protective order was issued against her.  Thus, Chief Frankland was packing the Hutto Police Department with officers from the City of Galveston without allowing a Hutto professional standards officer to conduct a full and complete investigation.

> 3.     Hutto's Policy, Practice, and/or Custom of Hiring, Failing to Train, and Failing to Supervise Officer Parris was a Moving Force Behind and Caused Jeremy's Damages

87.     Hutto's policy, practice, and/or custom of hiring, failing to train, and failing to supervise Officer Parris was a moving force behind and caused Jeremy's damages.  Hutto knew that that Officer Parris was overly aggressive and would assault people in connection with his law enforcement activities, but Hutto chose to consciously disregard and be deliberately indifferent to, and act in an objectively unreasonable manner regarding, Officer Parris's known disposition and tendencies.

88.     On August 8, 2017, less than one year before Officer Parris's assault of Jeremy, Officer Parris made application to Hutto for a police officer/police cadet position.  He included in his application information regarding his employment with the Galveston Police Department, representing that he had been employed with the Galveston Police Department since January 25, 2013.

89.     A background investigation of Officer Parris was conducted.  That background investigation revealed sufficient troubling information indicating that Hutto should not hire Officer Parris.

90.     As part of Officer Parris's employment history, he worked at the Four Aces Fight Club and the Eastside Combat Club.  Officer Parris indicated that, when employed at Four Aces Fight Club, he taught classes of martial arts to over thirty students.  He also indicated that, when employed at Eastside Combat Club, he taught grappling classes to over twenty students.  He further listed as his skills "defensive tactics instructor" and "combative instructor."  Moreover, in addition to having those skills, Officer Parris, upon information and belief, had a predisposition to offensively use skills he taught as an instructor in situations in which they should not be used.  He also disclosed that he had been under Internal Affairs investigation with the Galveston Police Department on three (3) occasions.

91.    Hutto should not have hired Officer Parris, and when it did so, it acted in a deliberately indifferent and objectively unreasonable manner toward the rights of citizens. It knew to a moral certainty that releasing Officer Parris on the street would result in someone, such as Jeremy, being assaulted. This was further demonstrated to Hutto after Officer Parris was hired – but before he was let loose on the street to act in his own behalf as a Hutto police officer.

92.    The pre-hire investigation of Officer Parris disclosed an opinion of a previous Galveston Police Department officer that Officer Parris was not very proactive. Officer Mary Clements, employed with the Hutto Police Department, previously worked with Officer Parris in Galveston. Officer Clements said that "there were times that [Officer Parris] could get a little frustrated." Upon information and belief, Officer Clements was indicating in as nice a way as she could that Officer Parris had a problem with becoming angry.

93.    If there was any doubt regarding Officer Parris's inappropriate use of force, Galveston Police Department Jeff Dagle removed that doubt. Detective Dagle said that he attended the police academy with Officer Parris, and that they began their career together at the Galveston Police Department. Detective Dagle said that Officer Parris had been employed by the Galveston Police Department on two different occasions. He further said that, during Officer Parris's first term of employment, "He was quick to 'go hands on' with suspects and didn't always speak well to people." Detective Dagle said that that tendency seems to have diminished somewhat, and he does not "go hands on as often." Clearly, not going hands on "as often" indicates that Officer Parris continued using inappropriate force with people in the Galveston community. This was another red flag to Hutto, indicating that it should not hire Officer Parris.

94.    The Hutto investigator also spoke with Sergeant John Courtney with the Galveston Police Department. Sergeant Courtney was at one time in Internal Affairs with the Galveston

Police Department.  Sergeant Courtney asked if Officer Parris was seeking employment with the Hutto Police Department, and the Hutto investigator responded affirmatively.  When asked whether Sergeant Courtney had ever supervised or investigated Officer Parris, his initial response was "He's a POS!!"  Sergeant Courtney also said that Officer Parris had been written up and disciplined numerous times for accidents and excessive force.  He further said that Officer Parris was currently under investigating regarding a fleet accident during a pursuit in which he disregarded numerous red lights and intersections on Broadway in Galveston.

95.     Galveston Police Investigator John Blackwell also provided an opinion of Officer Parris based upon working with him at the Galveston Police Department.  Officer Blackwell said that Officer Parris had a history of having fleet accidents usually involving excessive speeds.  He indicated that he thought Officer Parris would do better "in a smaller agency with less high stress crime areas."  This was indicative of the fact that Officer Parris was unable to appropriately handle stress, which is not an attribute which a police officer should possess if that police officer has a tendency to "go hands on" too quickly and/or inappropriately.  A lieutenant with the Galveston Police Department elaborated that Officer Parris "didn't make the best decisions during high stress driving situations."  Further, a reference form completed by Detective Jeff Dagle rated Officer Parris's maturity level only as "fair."  This was only one selection above "poor."  Hutto chose to hire Officer Parris regardless of all the red flags indicating it should not do so.  Regardless, Hutto still had an opportunity to terminate Officer Parris after it learned additional derogatory information about him through the field training process.  Once again, however,  Hutto chose to disregard all the warning signs and let Officer Parris loose on Hutto streets and unsuspecting citizens such as Jeremy.

96.     An October 8, 2017 daily observation report, regarding Officer Parris's field training with the Hutto Police Department, indicates that Officer Parris had a lengthy conversation with Field Training Officer Valles regarding cultural policing differences between the City of Galveston and the City of Hutto.  The field training officer explained to Officer Parris the importance of keeping a good relationship between Hutto police and the community.  The field training officer indicated that Office Parris "seemed to understand and seems to be buying into the process."  However, a police officer that acts reasonably should not need to "buy into the process" of keeping a good relationship with people in the community.  A reasonable police officer would act the same with every member of the community, regardless of his or her history and/or predisposition.

97.     An October 11, 2017 daily observation report, also completed by Field Training Officer Valles, indicated Hutto's lack of appropriate training of Officer Parris regarding conducting field sobriety tests.  Officer Parris was asked to check a specific driver for intoxication.  Officer Parris indicates that he had not done a DWI arrest for a few years.  Once Officer Parris started the Horizontal Gaze Nystagmus ("HGN") test, the field training officer could see that the subject's eyes, and that that there was no nystagmus visible.  The field training officer also noted that Officer Parris did not complete the correct HGN process.

98.     Officer Parris admitted that he did not even know the process.  The field training officer discussed the importance of knowing the process before actually attempting to conduct the test on a subject.  Officer Parris stated he would like to attend an SFST update class.

99.     An October 12, 2017 daily observation report indicates Officer Parris's lack of care and/or desire in conducting appropriate field sobriety tests.  Officer Parris and Field Training Officer Valles responded to back up a shift sergeant on a possible DWI traffic stop.  Officer Parris

had the subject go through the HGN test.  The field training officer did not see any clues of intoxication, and he asked Officer Parris to study the SFSTs and try to practice on live subjects when off-duty.  The field training officer, upon information and belief, observed that Officer Parris was an apparent novice at determining whether a person was intoxicated.  Regardless, Hutto continued to employ Officer Parris and allow him to conduct field sobriety tests.

100.    An October 20, 2017 daily observation report regarding Officer Parris's field training with Hutto disclosed additional problematic information regarding Officer Parris, which Hutto chose to ignore and instead continue employing Officer Parris.  Field Training Officer Valles wrote that Officer Parris asked whether Hutto Police Department officers could run red lights. Upon information and belief, Officer Parris was accustomed to running red lights in the City of Galveston and wanted to continue the practice in Hutto.  He was advised that Hutto officers are not supposed to run red lights.

101.    Officer Parris also indicated in substance that he was not feeling comfortable with DWI investigations.  He indicated that he would feel more comfortable once he completed the SFST update class.  The field training officer indicated that Officer Parris needed more repetitions in DWI investigations and the SFSTs in general.

102.    A DWI arrest situation further exposed Officer Parris's aggressive nature and tendencies.  A subject was not cooperating with commands, and Officer Parris was professional and calm during most of the encounter.  However, "PPO Parris did get into the subject's face at one point."  The field training officer had to intervene, and ask Officer Parris to move the subject to the patrol car.  The field training officer also wrote, "I will speak to PPO Parris about not meeting a belligerent person at their level."

103.    Officer Parris had at this point years of police experience.  If he was unable to control his temper and appropriately interact with people, he should have stopped being a police officer.  More importantly, for *Monell* purposes, Hutto should have terminated his employment. It took only one day for Officer Parris to – once again – demonstrate his belligerent and aggressive nature.

104.    An October 21, 2017 daily observation report regarding Officer Parris's field training program indicates that he "needs improvement in laws/standard operating procedures/policies."   Initially, Officer Parris had problems logging into a mobile computer. Officer Parris locked the computer, and Field Training Officer Valles had to contact IT to unlock it.  Officer Parris "seemed upset by the password issue he was having."  Officer Parris told the field training officer that Officer Parris was upset with himself.

105.    Officer Parris then responded to a disturbance in a roadway.  He arrested a person for public intoxication.  The field training officer asked Officer Parris to explain the elements of the public intoxication charge in his probable cause affidavit in a better way.  The field training officer wrote, "He seemed frustrated with the request."  The field training officer also told Officer Parris that he was taking an extra step on reports by clicking on a UCR button.  Officer Parris, wrote the field training officer, seemed frustrated with the field training officer.  The field training officer also said that he explained to Officer Parris that he was perceiving Officer Parris's body language as being upset with the field training officer.  The field training officer had to explain to Officer Parris that none of the corrections or constructive criticism he was receiving should be taken personally.  The field training officer wrote, "I explained that FTOs here do not know him and so when he displays that frustrated type of body language it will be perceived as negative."

Once again, Hutto had an opportunity to terminate Officer Parris's employment before he was let loose on the public.  It chose not to do so.

106.    A December 10, 2017 daily observation report once again confirmed to Hutto Officer Parris's continued problems with aggressive operation of a police vehicle.  That report was written by Field Training Officer Inlow.  Officer Inlow wrote in part that, when Officer Parris was driving a police vehicle and exited a driveway, he pulled the patrol vehicle in front of Officer Fraley's patrol vehicle.  The field training officer indicated that Officer Parris's operation of the vehicle almost caused a collision with Officer Fraley's vehicle.  The field training officer had to speak to Officer Parris "about the recklessness of his actions" and the "possible consequences if he would have caused a collision."  There is no reason that Hutto should have continued to employ Officer Parris after this continued receipt of information regarding his aggressive nature, loss of temper, and tendency to operate police vehicles in a manner which could result in serious injury or death.  Officer Parris had numerous issues in Galveston with unsafe operation of vehicles, and he apparently would not modify his conduct based upon Internal Affairs investigations.  Thus, Hutto was aware that training would not result in appropriate conduct by Officer Parris.

107.    The October 22, 2017 end of phase report, for Phase One of Officer Parris's field training at Hutto, indicates three areas in which Officer Parris needed to improve.  One such area reads, "PPO Parris tries to meet combative or non-compliant subjects at their level."  Another reads, "PPO Parris seems to take things personally when corrected or given direction.  He claims to be upset with himself.  However, the perception he gives is not that."  Field Training Officer Valles, who wrote that report, wrote that Officer Parris "should attend a de-escalation training and also an SSFT update."  Thus, two of the primary issues involving Officer Parris's interaction were pointed out at the end of phase one of his field training.  Officer Parris could not interact with

people without becoming upset, and he did not have a good understanding of how to determine when a person was intoxicated. Hutto apparently was not serious about assuring that Officer Parris was appropriately trained in how to de-escalate a situation. Based on TCOLE records, as shown above, it appears that Officer Parris attended merely a one-hour conflict resolution course on November 22, 2017. This was barely a tip-of-the-hat to a serious issue. That issue could not be remedied in a one-hour course.

108.    Field Training Officer Valles also wrote that he had spoken to Officer Parris "often" about Hutto Police Department's commitment to keeping its relationship with the community in good standing. He had to explain to Officer Parris Hutto's alleged commitment to treating everyone, including criminals, with professionalism and courtesy. "PPO Parris seemed to understand but I do not know he bought in." Such comments, and the ultimate interaction between Officer Parris and Jeremy, demonstrated at least two things. First, Hutto knew of Officer Parris's problems and chose to continue to employ him. Moreover, comments to Officer Parris about Hutto attempting to preserve a good relationship with its community were just lip-service to the idea. If Hutto wanted to preserve its alleged good standing with the community, it would not choose to employ officers like Officer Parris.

109.    Further, Officer Parris seemed to have issues with chain of command and/or supervision. Field Training Officer Valles wrote, "When PPO Parris asked about other [field training officers], he questioned how much experience they had. I explained that he should not worry about their experience because they had more [Hutto Police Department experience] than he did." Clearly, Officer Parris was a train wreck waiting to happen. Unfortunately, that wreck happened when he met Jeremy.

110.    Interestingly, during a portion of Phase Two field training with Hutto, Officer Alcocer was the field training officer for Officer Parris.  This is further evidence of the clear and unambiguous relationship between Officer Alcocer and Officer Parris, such that both officers knew that Officer Alcocer could have stopped what happened to Jeremy.

III.    Causes of Action

    A.    Cause of Action Against Defendant Gregory Richard Parris Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights: Excessive Force and Improper Seizure

111.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant Gregory Richard Parris is liable to Jeremy, pursuant to 42 U.S.C. § 1983, for violating Jeremy's rights guaranteed by the Fourth Amendment, as the Fourth Amendment has been incorporated to be applied to the States pursuant to the Fourteenth Amendment or otherwise, as a result of use of excessive force and making an improper seizure of Jeremy. Officer Parris acted and failed to act under color of state law at all times referenced in this pleading.   Officer Parris was deliberately indifferent to Jeremy's constitutional rights, and he acted in an objectively unreasonable manner when seizing and using force with Jeremy.   He exercised constitutionally-impermissible excessive force and seizure. Officer Parris violated clearly established constitutional rights, and his conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident.

112.    It was clearly-established law, in the Fifth Circuit, at the time Officer Parris chose to assault and Tase Jeremy, that while use of a Taser can be appropriate when a suspect consciously and deliberately continues to resist arrest, or consciously and deliberately continuously resists

being handcuffed (particularly when it is not the first method to gain compliance), Tasing is not appropriate, and therefore patently unreasonable, if it is either unclear that a person is resisting, or a person is not resisting at all.  Officer Parris had hit Jeremy in the head more than once, and he knew that the back of Jeremy's head had hit the truck bumper while Jeremy's body was falling to the ground after the first hit.  Thus, Officer Parris knew, based on such hits, and the knowledge that someone with such blows to the head could suffer a concussion, be stunned, and/or be disoriented, as well as the manner in which Jeremy was stumbling about while crawling after hitting the back of his head on the truck bumper, Jeremy was not actively resisting arrest but simply attempting to defend himself from Officer Parris's physical attack and/or regain some conscious sense of what was happening to him.  Officer Parris had learned this information, in fact, upon information and belief, because he was a professional boxing trainer.  This information is based upon an article regarding a boxing match occurring in Galveston, in which the boxer indicates that Officer Parris was a professional trainer and helped him with boxing fundamentals:

GALVESTON, Texas – Officer Demetrius Bowser took to the ring to support the 2018 Battle of  the Badges (BOTB), an event held in Galveston, Texas. This fun-filled evening highlights the accomplishments of first responders with one walking away with the win in each weight class title.



Bowser competed in and won the 190-195 pound weight division against Galveston firefighter Shay King.

"My family has always been involved in boxing, including my grandfather who made it to the Olympic trials." said Bowser "You could say I was a late-bloomer. This was my first match, but I've always been around boxing."

Bowser prepared for the match with the help of fellow officer, Gregory Parris.

"I had been training my whole life, but I took a break for a couple years," said Bowser. "So Officer Parris, who's a professional trainer, stepped in to get me back to the fundamentals of boxing and that helped a lot."

For Hutto Chief of Police Byron Frankland. Bowser's performance reflects the drive. dedication and toughness of his officers.

The relevant portion of the article reads, "Bowser prepared for the match with the help of fellow officer, Gregory Parris.  'I had been training my whole life, but I took a break for a couple years.'  Said Bowser.  'So Officer Parris, who's a professional trainer, stepped in to get me back to the fundamentals of boxing and that helped a lot.'"

113.    Officer Parris therefore knew, upon information and belief, not only fundamentals of boxing, but also various types of injuries which can occur when a person is hit by another person in the head.  In fact, Officer Parris's virtual immediate decision to punch Jeremy in the head was due to, upon information and belief, being a boxer, and not because it was an appropriate use of force.  Upon information and belief, Officer Parris's knowledge of head injuries that can occur as a result of hits to the head is support for an award of exemplary damages.  Upon information and belief, he knew of a substantial risk of serious injury to and/or death of Jeremy, and he consciously disregarded it.

114.    Further, it was, at the time, clearly-established law in the Fifth Circuit that a law enforcement officer's use of force is excessive when an officer strikes, punches, or violently slams a suspect who is not resisting arrest.  Use of a Taser is force well beyond striking or punching a person not resisting arrest and would thus be unconstitutional excessive force and seizure.  Further, it was clearly established law at the time Officer Parris Tased Jeremy that such Tasing should not occur if Jeremy was not accused of a serious crime, was not an immediate threat to the safety of law enforcement officers or others, and was not actively resisting arrest or attempting to evade arrest by flight.

115.    It was further clearly established that, even if all three of these elements were not met, Tasing could be patently unreasonable.  Jeremy was not guilty of Public Intoxication, or of the other two falsely–alleged crimes for which he would be charged as a result of Officer Parris.

Regardless, none of the alleged crimes, in light of what was actually occurring at the scene, were serious. Moreover, Jeremy was not an immediate threat to either of the two law enforcement officers at the scene or others. He had simply been using his telephone while standing at the back of a pickup. He did not possess any weapon – no knife, no gun, and no other physical object which naturally would be used as a weapon. Further, as indicated above, Jeremy was not actively resisting arrest, but instead simply attempting to passively defend himself from a continued assault by Officer Parris and at the same time gain some conscious recognition of what was happening to him.

116.    A person protecting himself or herself from a physical assault by a police officer does not equate to resisting arrest, but is instead a natural reaction pursuant to a God-given right to protect oneself, and the right not to have one's bodily integrity violated. Non-cooperation with an arrest is not by itself an act of the use of force against a police officer. A citizen does not need to merely stand, sit, or lye limp and not protect himself of herself from an improper and unreasonable physical assault by a police officer, simply because the police officer is wearing a uniform and carrying weapons. Police officers are not above the law.

117.    Officer Parris's use of force was clearly unreasonable, unconstitutional, and against clearly-established law. The fact that the Williamson County District Attorney's office, upon information and belief, referred the matter to the Texas Rangers for investigation is evidence of such. There were also no exigent circumstances allowing Officer Parris to use the force which he chose to use. Jeremy was not going anywhere, was not threatening anyone, and presented no threat of harm to anyone. Therefore, Officer Parris is not entitled to qualified immunity.

118.    Plaintiff seeks all remedies and damages available to Jeremy for Jeremy's 42 U.S.C. § 1983 claims. Damages suffered by Jeremy were caused and/or proximately caused by Officer

Parris, or in the alternative Officer Parris's conduct was a producing cause of Jeremy's damages. Therefore, Plaintiff seeks all legally-available damages for Plaintiff including but not necessarily limited to the following:

- past physical pain;

- any future physical pain;

- past mental anguish;

- future mental anguish;

- past physical impairment;

- any future physical impairment;

- medical and healthcare expenses incurred (paid plus owed) in the past;

- any medical and healthcare expenses that in reasonable probability will be incurred in the future;

- past disfigurement;

- any future disfigurement; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Jeremy's constitutional rights. Officer Parris's actions and inaction showed a reckless or callous disregard of, or indifference to, Jeremy's rights. Officer Parris knew that there was a substantial risk of harm and injury to Jeremy when he chose to take actions described in this pleading, but he nevertheless proceeded with conscious indifference to Jeremy's rights, welfare, and safety. Moreover, Plaintiff seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

B.      Cause of Action Against Defendant Jamie R. Alcocer Under 42 U.S.C. § 1983 for
        Violation of 4th Amendment Rights: Excessive Force and Improper Seizure

119.    In the alternative, without waiving any of the other causes of action pled herein,

without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all factual allegations above) to the extent they are not

inconsistent with the cause of action pled here, Defendant Officer Alcocer is liable to Jeremy,

pursuant to 42 U.S.C. § 1983, for violating Jeremy's rights guaranteed by the Fourth Amendment,

as the Fourth Amendment has been incorporated to be applied to the States pursuant to the

Fourteenth Amendment or otherwise, as a result of use of excessive force and making an improper

seizure of Jeremy.  Officer Alcocer acted and failed to act under color of state law at all times

referenced in this pleading.  Officer Alcocer was deliberately indifferent to Jeremy's constitutional

rights, and she acted in an objectively unreasonable manner when seizing and using force with

Jeremy, and failing to act as a bystander while Officer Parris seized and used force with Jeremy.

Officer Alcocer exercised constitutionally-impermissible excessive force and seizure, and failing

to act as a bystander while Officer Parris seized and used force with Jeremy.  Officer Alcocer

violated clearly established constitutional rights, and her conduct was objectively unreasonable in

light of clearly established law at the time of the relevant incident.

120.    It was clearly-established law, in the Fifth Circuit, at the time Officer Parris chose

to assault and Tase Jeremy, that while use of a Taser can be appropriate when a suspect consciously

and deliberately continues to resist arrest, or consciously and deliberately continuously resists

being handcuffed (particularly when it is not the first method to gain compliance), Tasing is not

appropriate, and therefore patently unreasonable, if it is either unclear that a person is resisting, or

a person is not resisting at all.  Officer Parris hit Jeremy in the head more than once, and he knew

that the back of Jeremy's head had hit the truck bumper while Jeremy's body was falling to the

ground after the first hit.  Thus, Officer Parris knew, based on such hits, and the knowledge that someone with such blows to the head could suffer a concussion, be stunned, and/or be disoriented, as well as the manner in which Jeremy was stumbling about while crawling after hitting the back of his head on the truck bumper, Jeremy was not actively resisting arrest but simply attempting to defend himself from Officer Parris's physical attack and/or regain some conscious sense of what was happening to him.

121.    Further, it was at the time clearly-established law in the Fifth Circuit that a law enforcement officer's use of force is excessive when an officer strikes, punches, or violently slams a suspect who is not resisting arrest.  Use of a Taser is force well beyond striking or punching a person not resisting arrest and would thus be unconstitutional excessive force and seizure.  Further, it was clearly established law at the time Officer Parris Tased Jeremy that such Tasing should not occur if Jeremy was not accused of a serious crime, was not an immediate threat to the safety of law enforcement officers or others, and was not actively resisting arrest or attempting to evade arrest by flight.

122.    It was further clearly established that, even if all three of these elements were not met, Tasing could be patently unreasonable.  Jeremy was not guilty of Public Intoxication, or of the other two falsely–alleged crimes for which he would be charged as a result of Officer Parris's and Officer Alcocer's action and/or inaction.  Regardless, none of the alleged crimes, in light of what was actually occurring at the scene, were serious.  Moreover, Jeremy was not an immediate threat to either of the two law enforcement officers at the scene or others.  He had simply been using his telephone while standing at the back of a pickup.  He did not possess any weapon – no knife, no gun, and no other physical object which naturally would be used as a weapon.  Further, as indicated above, Jeremy was not actively resisting arrest, but instead simply attempting to

passively defend himself from a continued assault by Officer Parris and at the same time gain some conscious recognition of what was happening to him.

123.    A person protecting himself or herself from a physical assault by a police officer does not equate to resisting arrest, but is instead a natural reaction pursuant to a God-given right to protect oneself, and the right not to have one's bodily integrity violated.  Non-cooperation with an arrest is not by itself an act of the use of force against a police officer.  A citizen does not need to merely stand, sit, or lye limp and not protect himself of herself from an improper and unreasonable physical assault by a police officer, simply because the police officer is wearing a uniform and carrying weapons.  Police officers are not above the law.

124.    Officer Parris's use of force was clearly unreasonable, unconstitutional, and against clearly-established law.  The fact that the Williamson County District Attorney's office, upon information and belief, referred the matter to the Texas Rangers for investigation is evidence of such.  There were also no exigent circumstances allowing Officer Parris to use the force which he chose to use.  Jeremy was not going anywhere, was not threatening anyone, and presented no threat of harm to anyone.

125.    Officer Alcocer knew that Hutto policy would allow her and/or Officer Parris to "unarrest" Jeremy.  However, neither she nor Officer Parris chose to do so.  Instead, they continued with the ruse that Jeremy should remain seized, and arrested, and be prosecuted for offenses which he did not commit.  Hutto policy, as Defendants knew, reads in part, "When an arrest is conducted and it is later determined that the arrestee should be 'unarrested' and released, for whatever reason, a supervisor shall immediately be notified.  Every courtesy possible shall be extended to the individual(s)."  Officer Alcocer was Officer Parris's supervisor, as pointed out elsewhere in this pleading.  After an "unarrest," a Hutto lieutenant is required to review what occurred and forward

the file to the Hutto City Attorney. The Hutto City Attorney would then evaluate the City's liability and respond in writing to the lieutenant. Officer Parris and Officer Alcocer chose not to unarrest Jeremy and thereby compounded and increased Jeremy's damages.

126. It was further established in the Fifth Circuit, at the time Jeremy was assaulted, that a police officer who is a bystander can be held liable pursuant to 42 U.S.C. § 1983 under the theory of bystander liability. That theory of liability applies when the bystander officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. As demonstrated through facts pled in this pleading, Officer Alcocer's actions and inaction meets all three elements. Therefore, Officer Alcocer is liable to Plaintiff and is not entitled to qualified immunity.

127. Plaintiff seeks all remedies and damages available to Jeremy for Jeremy's 42 U.S.C. § 1983 claims. Damages suffered by Jeremy were caused and/or proximately caused by Officer Alcocer, or in the alternative Officer Alcocer's conduct was a producing cause of Jeremy's damages. Therefore, Plaintiff seeks all legally-available damages for Plaintiff including but not necessarily limited to the following:

- past physical pain;

- any future physical pain;

- past mental anguish;

- future mental anguish;

- past physical impairment;

- any future physical impairment;

- medical and healthcare expenses incurred (paid plus owed) in the past;

- any medical and healthcare expenses that in reasonable probability will be incurred in the future;

- past disfigurement;

- any future disfigurement; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Jeremy's constitutional rights. Officer Alcocer's actions and inaction showed a reckless or callous disregard of, or indifference to, Jeremy's rights. Officer Alcocer knew that there was a substantial risk of harm and injury to Jeremy when she chose to take actions described in this pleading, and/or chose not to act, but she nevertheless proceeded with conscious indifference to Jeremy's rights, welfare, and safety. Moreover, Plaintiff seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

> ### C.   Cause of Action Against Defendant Gregory Richard Parris Under 42 U.S.C. § 1983 for Violation of 1st Amendment Rights: Retaliation for Exercise of Rights to Free Speech and/or to Petition the Government for a Redress of Grievances

128.   In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant Gregory Richard Parris is liable to Jeremy, pursuant to 42 U.S.C. § 1983, for violating Jeremy's rights guaranteed by the First Amendment, as the First Amendment has been incorporated to be applied to the States pursuant to the Fourteenth Amendment or otherwise, as a result of his retaliation against Jeremy for Jeremy's exercise of his First Amendment rights. Jeremy was engaged in constitutionally-protected activity when he asked what the probable cause was for Officer Parris to force Jeremy to provide his wallet to Officer Parris. Jeremy used his right to free speech to ask Officer Parris for the legal basis for his request, and he was also petitioning Officer Parris, as a governmental representative, regarding

the request.  Officer Parris's subsequent actions, referenced in this pleading, were in retaliation for Jeremy's exercise of his First Amendment rights, and those actions caused Jeremy to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity. Being beaten, Tased, arrested, and prosecuted would chill First Amendment exercise by virtually any person.  The subsequent prosecutions of Jeremy, in retaliation for exercise of Jeremy's First Amendment rights, implicate not only First Amendment rights but also rights pursuant to the Fourth Amendment and/or Fourteenth Amendment.  Those rights are again asserted in another section of this pleading below out of an abundance of caution.

129.    Officer Parris's adverse actions were substantially motivated by Jeremy's exercise of constitutionally-protected conduct.  Officer Parris retaliated against Jeremy for exercising his First Amendment rights of free expression, to speech, and/or to a redress of grievances.  Officer Parris acted and failed to act under color of state law at all times referenced in this pleading. Officer Parris was deliberately indifferent to Jeremy's constitutional rights, and he acted in an objectively unreasonable manner when seizing and using force with Jeremy, and subsequently causing Jeremy to be prosecuted, as a result of Jeremy's exercise of his First Amendment rights. Officer Parris exercised constitutionally-impermissible excessive force and seizure.  Officer Parris violated clearly established constitutional rights, and his conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident.

130.    Jeremy seeks all remedies and damages available to him for his 42 U.S.C. § 1983 claims.  Damages suffered by Jeremy were caused and/or proximately caused by Officer Parris, or in the alternative Officer Parris's conduct was a producing cause of Jeremy's damages.  Therefore, Plaintiff seeks all legally-available damages for Plaintiff including but not necessarily limited to the following:

- past physical pain;

- any future physical pain;

- past mental anguish;

- future mental anguish;

- past physical impairment;

- any future physical impairment;

- medical and healthcare expenses incurred (paid plus owed) in the past;

- any medical and healthcare expenses that in reasonable probability will be incurred in the future;

- past disfigurement;

- any future disfigurement;

- economic damages occurring as a result of the prosecutions, including but not necessarily limited to attorneys' fees, costs, expenses, and court costs; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Jeremy's constitutional rights. Officer Parris's actions and inaction showed a reckless or callous disregard of, or indifference to, Jeremy's rights. Officer Parris knew that there was a substantial risk of harm and injury to Jeremy when he chose to take actions described in this pleading, but he nevertheless proceeded with conscious indifference to Jeremy's rights, welfare, and safety. Moreover, Plaintiff seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

> **D.** **Cause of Action Against Defendant Jamie R. Alcocer Under 42 U.S.C. § 1983 for Violation of 1st Amendment Rights: Retaliation for Exercise of Rights to Free Speech and/or to Petition the Government for a Redress of Grievances**

131. In the alternative, without waiving any of the other causes of action pled herein,

without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Officer Alcocer is liable to Jeremy, pursuant to 42 U.S.C. § 1983, for violating Jeremy's rights guaranteed by the First Amendment, as the First Amendment has been incorporated to be applied to the States pursuant to the Fourteenth Amendment or otherwise, as a result of Officer Parris's retaliation against Jeremy for Jeremy's exercise of his First Amendment rights. Jeremy was engaged in constitutionally-protected activity when he asked what the probable cause was for Officer Parris to force Jeremy to provide his wallet to Officer Parris. Jeremy used his right to free speech to ask Officer Parris for the legal basis for his request, and he was also petitioning Officer Parris, as a governmental representative, regarding the request. Officer Parris's subsequent actions, referenced in this pleading, were in retaliation for Jeremy's exercise of his First Amendment rights, and those actions caused Jeremy to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity. Being beaten, Tased, arrested, and prosecuted would chill First Amendment exercise by virtually any person. The subsequent prosecutions of Jeremy, in retaliation for exercise of Jeremy's First Amendment rights, implicate not only First Amendment rights but also rights pursuant to the Fourth Amendment and/or Fourteenth Amendment. Those rights are again asserted in another section of this pleading below out of an abundance of caution.

132.     Officer Parris's adverse actions were substantially motivated by Jeremy's exercise of constitutionally-protected conduct. Officer Parris retaliated against Jeremy for exercising his First Amendment rights of free expression, to speech, and/or to a redress of grievances. Officer Parris acted and failed to act under color of state law at all times referenced in this pleading. Officer Parris was deliberately indifferent to Jeremy's constitutional rights, and he acted in an

objectively unreasonable manner when seizing and using force with Jeremy, and subsequently causing Jeremy to be prosecuted, as a result of Jeremy's exercise of his First Amendment rights. Officer Parris exercised constitutionally-impermissible excessive force and seizure. Officer Parris violated clearly established constitutional rights, and his conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident.

133.    It was further established in the Fifth Circuit, at the time Jeremy was assaulted, that a police officer who is a bystander can be held liable pursuant to 42 U.S.C. § 1983 under the theory of bystander liability. That theory of liability applies when the bystander officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. As demonstrated through facts pled in this pleading, Officer Alcocer's action and inaction meets all three elements. Therefore, Officer Alcocer is liable to Plaintiff, for claims pled in this portion of this pleading, pursuant to this theory of liability.

134.    Jeremy seeks all remedies and damages available to him for his 42 U.S.C. § 1983 claims against Officer Alcocer. Damages suffered by Jeremy were caused and/or proximately caused by Officer Alcocer, or in the alternative Officer Alcocer's conduct was a producing cause of Jeremy's damages. Therefore, Plaintiff seeks all legally-available damages for Plaintiff including but not necessarily limited to the following:

- past physical pain;

- any future physical pain;

- past mental anguish;

- future mental anguish;

- past physical impairment;

- any future physical impairment;

- medical and healthcare expenses incurred (paid plus owed) in the past;

- any medical and healthcare expenses that in reasonable probability will be incurred in the future;

- past disfigurement;

- any future disfigurement;

- economic damages occurring as a result of the prosecutions, including but not necessarily limited to attorneys' fees, costs, expenses, and court costs; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Jeremy's constitutional rights. Officer Alcocer's actions and inaction showed a reckless or callous disregard of, or indifference to, Jeremy's rights. Officer Alcocer knew that there was a substantial risk of harm and injury to Jeremy when she chose to take actions described in this pleading, or in the alternative not to act, but she nevertheless proceeded with conscious indifference to Jeremy's rights, welfare, and safety. Moreover, Plaintiff seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

> E.    Cause of Action Against Defendant Gregory Richard Parris Under 42 U.S.C. § 1983 for Violation of 1st Amendment, 4th Amendment, and/or 14th Amendment Rights: False Arrest, Malicious/False Prosecution, and/or Due Process Violations

135.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant Gregory Richard Parris is liable to Jeremy, pursuant to 42 U.S.C. § 1983, for violating Jeremy's rights guaranteed by the First Amendment, Fourth Amendment, and/or Fourteenth Amendment as a result of the false arrest, and malicious and/or false prosecution of, Jeremy for crimes which he did not commit. Officer Parris

provided false information to the Williamson County District Attorney's office and/or others for the purpose of having Jeremy prosecuted. He did so with malicious intent and out of anger directed toward Jeremy. He thus initiated criminal charges without probable cause. This resulted in violation of Jeremy's rights pursuant to the Fourth Amendment and/or Fourteenth Amendment, specifically those related to improper and/or malicious prosecution, wrongful initiation of legal process (criminal prosecution), and/or the right to due process.

136.    This also was a violation of Jeremy's rights pursuant to the First Amendment, because such prosecution was retaliation for Jeremy's free exercise of his First Amendment rights when asking about probable cause for Officer Parris demanding that Jeremy provide his wallet to Officer Parris. Jeremy was wrongfully arrested and prosecuted as a result of Officer Parris's actions. Thus, deliberations by and/or actions of prosecutors and others who actually began the criminal prosecution, whether through drafting of an information or otherwise, were tainted by Officer Parris's actions. Officer Parris had not only malicious intent directed toward Jeremy, as was demonstrated through his physical assault of Jeremy, but he also had malicious motives. Officer Parris was upset that Jeremy would lawfully seek to question his constitutional authority, and he thus engaged in all actions referenced in this pleading. Officer Parris's malicious motives lead him to withhold relevant information or otherwise misdirect prosecutors and/or others involved in the prosecution process by omission or commission. Upon information and belief, only when one or more prosecutors were able to view body cam recordings did those prosecutors dismiss proceedings "in the interest of justice."

CAUSE NO. 18-03299-2

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | COUNTY COURT AT LAW #2 |
| | § | |
| VS. | § | OF |
| | § | |
| JEREMY ALAN ROGERS | § | WILLIAMSON COUNTY, TEXAS |

### STATE'S MOTION TO DISMISS

Now comes the State of Texas by and through County Attorney Dee Hobbs, and, although there being probable cause to arrest Defendant in the above-styled cause, moves the Court to dismiss this case for the following reason(s):

☐ Probable cause to arrest, but insufficient evidence to sustain a conviction.

☐ At the request of the complaining witness.

☐ Failure of complaining witness to appear.

☐ Defendant paid restitution.

☐ Co-Defendant pleaded "guilty/no contest" in companion case

☐ Defendant pleaded "guilty/no contest" in companion case

☐ Defendant successfully completed the following course(s):

☐ Defendant successfully completed the Williamson County Pre-Trial Intervention Program.

☐ Impractical to prosecute due to time elapsed since the case was filed.

☐ Defendant filed forgery affidavit.

☐ As part of a plea bargain.

☒ In the interest of justice.

☐ Other:

Wherefore the State respectfully requests the above-styled cause be dismissed.

FILED
at 11:01 o'clock A M
ES
JUL 1 8 2018
Nancy E. Reiter
County Clerk, Williamson Co., TX

Respectfully submitted,

_____
ASSISTANT COUNTY ATTORNEY
Williamson County, Texas

### ORDER OF DISMISSAL

On this date the Court considered the *State's Motion to Dismiss* and finds that said motion should be granted. It is hereby ORDERED that the above-styled cause be dismissed.

SIGNED this the ___ day of _____, 20___

_____
JUDGE PRESIDING

Filed: 7/19/2018 8:07 AM
Lisa David, District Clerk
Williamson County, Texas
Anita Collins

**18-1169-K26**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | 26th JUDICIAL DISTRICT COURT |
| | § | |
| VS. | § | OF |
| | § | |
| JEREMY ALAN ROGERS | § | WILLIAMSON COUNTY, TEXAS |

## STATE'S MOTION TO DISMISS

NOW COMES the State of Texas by and through her District Attorney and respectfully requests the Court to dismiss the above entitled and numbered criminal action in which the defendant is charged with the offense of **ASSAULT PUBLIC SERVANT** for the reason:

☐   Probable Cause to arrest, but evidence is insufficient to sustain a conviction;

☐   The complaining witness has requested dismissal;

☐   The case has been referred to the County Attorney's office for prosecution as a misdemeanor. The misdemeanor offense    was filed in cause number    and defendant entered a plea of guilty on    . The defendant has agreed that this case is not subject to expunction.

☐   On    , this case was refiled in the County Court at Law of Williamson County, Texas, in Cause Number    , for the offense of    .

☐   (The following can be used in the "ORDER" portion of the Motion to Dismiss form.) It is further ordered that the bond filed in the above cause is hereby transferred to cause number    and remains in effect until that cause number is disposed.

☐   As part of a plea bargain;

☐   The defendant has been granted immunity in light of his testimony;

☐   On _____ this case was declined by the District Attorney's Office.

☒   In the Interest of Justice

WHEREFORE, it is prayed that the above entitled and numbered cause be dismissed.

Respectfully submitted,

Lindsey Roberts
Assistant District Attorney
Williamson County, Texas

## ORDER

The foregoing motion having been presented to me on this the _23_ day of _July_ , A.D. 20 _18_ , and the same having been considered, it is, therefore, ORDERED, ADJUDGED and DECREED that said above entitled and numbered cause be and the same is hereby dismissed.

Judge of the 26th District Court
Williamson County, Texas

Filed: 07/23/18    9:56 AM
Lisa David, District Clerk
Williamson County, Texas
By: Allen, Shannon



Thus, Officer Parris deceived prosecutors and/or others connected with relevant prosecutions against Jeremy.

137.    Moreover, the prosecution occurred in retaliation for Jeremy's exercise of his First Amendment rights to speech, expression, and/or to petition his government for a redress of grievances.  The prosecution of Jeremy meets the elements for malicious criminal prosecution pursuant to Texas law.  A criminal prosecution was commenced against Jeremy, and Officer Parris initiated or procured the prosecution.  The prosecution was terminated in Jeremy's favor, and he was innocent of the charges.  Officer Parris did not have probable cause to initiate or procure the prosecution, but he instead did so with malice.  Jeremy suffered damages as a result of the

prosecution and which are referenced in this pleading. Officer Parris acted and failed to act under color of state law at all times referenced in this pleading. Officer Parris was deliberately indifferent to Jeremy's constitutional rights, and he acted in an objectively unreasonable manner. Officer Parris violated clearly established constitutional rights, and his conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident.

138.    It was clearly-established law, in the Fifth Circuit, at the time Officer Parris chose to seek prosecution of Jeremy, that a law enforcement officer should not submit false or misleading information, or omit material information, when communicating with prosecutors and/or others regarding anticipated criminal prosecution. It was also clearly-established law that a law enforcement officer should not arrest a person, without probable cause, and then initiate or procure prosecution of that person as a result of the false and improper arrest. Therefore, Officer Parris is not entitled to qualified immunity.

139.    Jeremy seeks all remedies and damages available to him for his 42 U.S.C. § 1983 claims. Damages suffered by Jeremy were caused and/or proximately caused by Officer Parris, or in the alternative Officer Parris's conduct was a producing cause of Jeremy's damages. Therefore, Plaintiff seeks all legally-available damages for Plaintiff including but not necessarily limited to the following:

- past physical pain;

- any future physical pain;

- past mental anguish;

- future mental anguish;

- past physical impairment;

- any future physical impairment;

- medical and healthcare expenses incurred (paid plus owed) in the past;

- any medical and healthcare expenses that in reasonable probability will be incurred in the future;

- past disfigurement;

- any future disfigurement;

- economic damages occurring as a result of the prosecutions, including but not necessarily limited to attorneys' fees, costs, expenses, and court costs; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Jeremy's constitutional rights. Officer Parris's actions and inaction showed a reckless or callous disregard of, or indifference to, Jeremy's rights. Officer Parris knew that there was a substantial risk of harm and injury to Jeremy when he chose to take actions described in this pleading, but he nevertheless proceeded with conscious indifference to Jeremy's rights, welfare, and safety. Moreover, Plaintiff seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

     F.     **Cause of Action Against Defendant Jamie R. Alcocer Under 42 U.S.C. § 1983 for Violation of 1st Amendment, 4th Amendment, and/or 14th Amendment Rights: False Arrest**

140.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant Jamie R. Alcocer is liable to Jeremy, pursuant to 42 U.S.C. § 1983, for violating Jeremy's rights guaranteed by the First Amendment, Fourth Amendment, and/or Fourteenth Amendment as a result of the false arrest of Jeremy for crimes which he did not commit.

141.    Moreover, the arrest occurred in retaliation for Jeremy's exercise of his First Amendment rights to speech, expression, and/or to petition his government for a redress of grievances.  Jeremy was wrongfully arrested and ultimately prosecuted as a result of Officer Parris's and Officer Alcocer's actions, and Officer Alcocer's inaction.  Criminal prosecutions were commenced against Jeremy.  Prosecutions were terminated in Jeremy's favor, and he was innocent of the charges.  Jeremy suffered damages as a result of the prosecutions and which are referenced in this pleading.

142.    Officer Alcocer acted and failed to act under color of state law at all times referenced in this pleading.  Officer Alcocer was deliberately indifferent to Jeremy's constitutional rights, and she acted in an objectively unreasonable manner.  Officer Alcocer violated clearly established constitutional rights, and her conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident.

143.    It was clearly-established law, in the Fifth Circuit, at the time Officer Parris's and Officer Alcocer's interaction with and arrest of Jeremy, that a law enforcement officer should not submit false or misleading information, or omit material information, when communicating with prosecutors and/or others regarding anticipated criminal prosecution.  It was also clearly-established law that a law enforcement officer should not arrest a person, without a warrant and without probable cause that the person had committed a crime.  Therefore, Officer Alcocer is not entitled to qualified immunity.

144.    It was further established in the Fifth Circuit, at the time Jeremy was assaulted, that a police officer who is a bystander can be held liable pursuant to 42 U.S.C. § 1983 under the theory of bystander liability.  That theory of liability applies when the bystander officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to

prevent the harm; and (3) chooses not to act.  As demonstrated through facts pled in this pleading, Officer Alcocer's action and inaction meets all three elements.  Therefore, Officer Alcocer is liable to Jeremy pursuant to allegations made in this portion of this pleading.

145.    Jeremy seeks all remedies and damages available to him for his 42 U.S.C. § 1983 claims against Officer Alcocer.  Damages suffered by Jeremy were caused and/or proximately caused by Officer Alcocer, or in the alternative Officer Alcocer's conduct was a producing cause of Jeremy's damages.   Therefore, Plaintiff seeks all legally-available damages for Plaintiff including but not necessarily limited to the following:

- past physical pain;

- any future physical pain;

- past mental anguish;

- future mental anguish;

- past physical impairment;

- any future physical impairment;

- medical and healthcare expenses incurred (paid plus owed) in the past;

- any medical and healthcare expenses that in reasonable probability will be incurred in the future;

- past disfigurement;

- any future disfigurement;

- economic damages occurring as a result of the prosecutions, including but not necessarily limited to attorneys' fees, costs, expenses, and court costs; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Jeremy's constitutional rights.   Officer Alcocer's actions and inaction showed a

reckless or callous disregard of, or indifference to, Jeremy's rights. Officer Alcocer knew that there was a substantial risk of harm and injury to Jeremy when she chose to take actions described in this pleading, or chose not to act, but she nevertheless proceeded with conscious indifference to Jeremy's rights, welfare, and safety. Moreover, Plaintiff seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

G.      Cause of Action Against Defendant City of Hutto Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights:  Excessive Force and Improper Seizure

146.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Hutto is liable to Jeremy, pursuant to 42 U.S.C. § 1983, for violating Jeremy's rights guaranteed by the Fourth Amendment as the Fourth Amendment has been incorporated to apply to the States pursuant to the Fourteenth Amendment or otherwise, as a result of use of excessive force and improperly seizing Jeremy. Officer Parris and Officer Alcocer were at all times referenced in this pleading acting in the course and scope of their duties of and for Hutto, and they were acting color of state law. Hutto acted or failed to act under color of state law at all relevant times. Upon information and belief, Hutto's customs, practices, and/or policies caused, were a proximate cause, and/or were a producing cause of Jeremy's damages resulting from unconstitutional excessive force and seizure. Hutto's acts and/or inaction in adopting such customs, practices, and/or policies were done unreasonably and/or in deliberate indifference to the effect such policies would have – violation of constitutional rights. Therefore, Plaintiff seeks from Hutto all legally-available damages, including but not necessarily limited to the following:

- past physical pain;

- any future physical pain;

- past mental anguish;

- future mental anguish;

- past physical impairment;

- any future physical impairment;

- medical and healthcare expenses incurred (paid plus owed) in the past;

- any medical and healthcare expenses that in reasonable probability will be incurred in the future;

- past disfigurement; and

- any future disfigurement.

147.   Upon information and belief, the Hutto chief of police was the chief policymaker for Hutto at all times relevant to this pleading, and involving police matters material and/or at issue and referenced in this pleading, and he was the one that determined the customs, practices, and policies referenced herein.  In the alternative, another relevant chief policymaker, at all times relevant to this pleading, determined the customs, practices, and policies referenced herein.  The chief policymaker's failure to adopt, upon information and belief, policies referenced in this pleading, as well as his or her failure to stop customs, practices, and policies which developed and which are mentioned in this pleading, were intentional choices.  Thus, Hutto was deliberately indifferent to, and acted in an objectively unreasonably manner regarding, Jeremy's constitutional rights.  These customs, practices, and policies were moving forces behind the violation of Plaintiff's rights, showed deliberate indifference to the known or obvious consequences of constitutional violations, and were objectively unreasonable and resulted in objectively unreasonable and/or deliberately indifferent actions by Officer Parris.

H.      Cause of Action Against Defendant City of Hutto Under 42 U.S.C. § 1983 for Violation of 4th Amendment and/or 14th Amendment Rights:  False Arrest, Malicious/False Prosecution, and/or Due Process Violations

148.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Hutto is liable to Jeremy, pursuant to 42 U.S.C. § 1983, for violating Jeremy's rights guaranteed by the Fourth Amendment and the Fourteenth Amendment as a result of the false arrest, and malicious and/or false prosecution of, Jeremy for a crime which he did not commit – alleged public intoxication.  Plaintiff incorporates by reference as if fully set forth in this section of this pleading the sections above entitled "Cause of Action Against Defendant Gregory Richard Parris Under 42 U.S.C. § 1983 of Violation of 1st Amendment, 4th Amendment, and/or 14th Amendment Rights:  False Arrest, Malicious/False Prosecution, and/or Due Process Violations" and "Cause of Action Against Defendant Jamie R. Alcocer Under 42 U.S.C. § 1983 of Violation of 1st Amendment, 4th Amendment, and/or 14th Amendment Rights:  False Arrest."

149.    Officers Parris and Officer Alcocer were at all times referenced in this pleading acting in the course and scope of their duties of and for Hutto, and they were acting color of state law.  Hutto acted or failed to act under color of state law at all relevant times.  Upon information and belief, Hutto's customs, practices, and/or policies caused, were a proximate cause, and/or were a producing cause of Jeremy's damages resulting from unconstitutional false arrest, and malicious and/or false prosecution of, Jeremy for a crime which he did not commit – alleged public intoxication.  Hutto's acts and/or inaction in repealing its field sobriety test policy, and thus establishing the policy that no field sobriety test would occur, were done unreasonably and/or in

deliberate indifference to the effect such policies would have – violation of constitutional rights and other occurrences referenced herein.  Hutto knew to a moral certainty that people would be arrested without probable cause, because Hutto chose not to require that its officers conduct field sobriety testing before arresting, and then obviously prosecuting, people for being allegedly publicly intoxicated when they were not (such as Jeremy).  Therefore, Plaintiff seeks from Hutto all legally-available damages, including but not necessarily limited to the following:

- past physical pain;

- any future physical pain;

- past mental anguish;

- future mental anguish;

- past physical impairment;

- any future physical impairment;

- medical and healthcare expenses incurred (paid plus owed) in the past;

- any medical and healthcare expenses that in reasonable probability will be incurred in the future;

- past disfigurement;

- economic damages occurring as a result of the prosecution, including but not necessarily limited to attorneys' fees, costs, expenses, and court costs; and

- any future disfigurement.

150.    Upon information and belief, the Hutto chief of police was the chief policymaker for Hutto at all times relevant to this pleading, and involving police matters material and/or at issue and referenced in this pleading, and he was the one that determined the customs, practices, and policies referenced herein.  In the alternative, another relevant chief policymaker, at all times relevant to this pleading, determined the customs, practices, and policies referenced herein.  The

chief policymaker's adoption and/or repeal of the field sobriety test policy referenced in this pleading, as well as his or her failure to stop customs, practices, and policies which developed and which are mentioned in this pleading, were intentional choices.  Thus, Hutto was deliberately indifferent to, and acted in an objectively unreasonably manner regarding, Jeremy's constitutional rights.  These customs, practices, and policies were moving forces behind the violation of Plaintiff's rights, showed deliberate indifference to the known or obvious consequences of constitutional violations, and were objectively unreasonable and resulted in objectively unreasonable and/or deliberately indifferent actions by Officer Parris.

IV.     Concluding Allegations

A.     Conditions Precedent

151.    All conditions precedent to assertion of Plaintiff's claims have occurred.

B.     Use of Documents

152.    Plaintiff intends to use at one or more pretrial proceedings, in motion practice, and/or at trial all documents produced by Defendants in this case in response to written discovery requests.

C.     Jury Demand

153.    Plaintiff demands a jury trial on all issues which may be tried to a jury.

D.     Prayer

154.    For these reasons, Plaintiff asks that Defendants be summoned to appear and answer, and that Plaintiff have judgment for damages within the jurisdictional limits of the court and against Defendants, jointly and severally, as legally applicable, for:

a)      actual damages of and for Plaintiff for including but not necessarily limited to the following:

- past physical pain;

- any future physical pain;

- past mental anguish;

- future mental anguish;

- past physical impairment;

- any future physical impairment;

- medical and healthcare expenses incurred (paid plus owed) in the past;

- any medical and healthcare expenses that in reasonable probability will be incurred in the future;

- past disfigurement;

- any future disfigurement; and

- economic damages occurring as a result of the prosecutions, including but not necessarily limited to attorneys' fees, costs, expenses, and court costs;

b)      exemplary/punitive damages from and against Officer Parris and Officer Alcocer;

c)      reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

d)      court costs and all other recoverable costs;

e)      prejudgment and postjudgment interest at the highest allowable rates;  and

f)      all other relief, legal and equitable, general and special, to which Plaintiff is entitled.

Respectfully submitted,


_____/s/ T. Dean Malone_____
T. Dean Malone
Attorney-in-charge
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904
dean@deanmalone.com

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:        (214) 670-9904
michael.oconnor@deanmalone.com

Attorneys for Plaintiff


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January _____, 2020 I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to the following attorneys:

| | |
|---|---|
| Mr. Blair J. Leake | Joanna Lippman Salinas |
| Mr. Archie Carl Pierce | Fletcher, Farley, Shipman & Salinas, L.L.P. |
| Wright & Greenhill, P.C. | 2530 Walsh Tarlton Lane, Suite 150 |
| 900 Congress Ave., Suite 500 | Austin, Texas  78746 |
| Austin, Texas 78701 | |


_____/s/ T. Dean Malone_____
T. Dean Malone